## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| THG Holdings LLC, *et al.*, | Case No. 19-11689 (JTD) |
| Debtors.[1] | Joint Administration Requested |

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (III) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 363 AND 364, AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(C)

The above-captioned debtors and debtors in possession (the "Debtors") in the above-captioned cases hereby move (the "Motion"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order (proposed form attached hereto as **Exhibit C**, the "Interim Order") and a final order (the "Final Order"), inter alia,

(a) authorizing the Debtors to obtain secured postpetition financing on a superpriority basis (the "DIP Facility") pursuant to the terms and conditions of that certain Debtor-in-Possession Financing Term Sheet,

---

[1]     The Debtors in these cases, along with the last four digits of each Debtors' federal EIN, are as follows: THG Holdings LLC (8292); True Health Group LLC (9158); True Health Clinical LLC (5272); True Health Diagnostics LLC (9452); True Health IP LLC (5427); Outreach Management Solutions LLC d/b/a True Health Outreach (9424); Health Core Financial LLC d/b/a True Health Financial (6614). The Debtors' mailing address is 3803 Parkwood Blvd., Suite 400, Frisco, Texas 75034.

dated as of July 30, 2019 (the "Term Sheet"), attached hereto as **Exhibit B**, in the aggregate principal amount of up to $7,847,000;[2]

(b) authorizing the Debtors to execute any other documents, agreements, and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Agent (as the same may be amended, restated, supplemented, or otherwise modified from time to time, and collectively with the Term Sheet, the "DIP Loan Documents");

(c) granting to the DIP Agent, for itself and for the benefit of the DIP Lenders, first priority security interests in and liens on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable, the Interim Order and the Final Order, as applicable (collectively, and including all "Obligations" as described in the Term Sheet, the "DIP Obligations"), subject only to prior payment of the Carve Out (as defined below);

(d) granting allowed superpriority administrative expense claims to the DIP Agent and the DIP Lenders;

(e) authorizing the Debtors to use cash collateral, as defined in section 363 of the Bankruptcy Code, in or on which the DIP Agent, the Prepetition Secured Parties, or the Prepetition Second Lien Lenders (as defined below) have a lien, security interest, or other interest (including, without limitation, any adequate protection liens or security interests) whether existing on the Petition Date, arising pursuant to the Interim Order, or otherwise (the "Cash Collateral");

(f) authorizing the Debtors to grant adequate protection to the Prepetition Secured Parties and the Prepetition Second Lien Lenders (as defined below); and

(g) scheduling a hearing (the "Final Hearing"), pursuant to Bankruptcy Rule 4001(c)(2), to consider entry of the Final Order ((a) through (g) collectively, the "Requested Relief").

The Debtors rely upon and incorporate by reference the *Declaration of Christian Richards in Support of First Day Relief* (the "Richards Declaration") and *Declaration of Clifford A. Zucker in Support of First Day Relief* (the "Zucker Declaration," and together with the

---

[2]    The "DIP Lenders" shall mean the Prepetition Secured Parties (as defined below) (from and after the consummation of the DIP Facility).  The Prepetition First Lien Administrative Agent (as defined below) shall serve as the "DIP Agent" for and on behalf of the DIP Lenders.

Richards Declaration, the "<u>First Day Declarations</u>"), which was filed with the Court concurrently herewith.   In further support of the Motion, the Debtors, by and through their undersigned proposed co-counsel, respectfully state as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The Debtors consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

## BACKGROUND

4.      On July 30, 2019 (the "<u>Petition Date</u>"), the Debtors each commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court.  The Debtors have requested joint administration of their chapter 11 cases for procedural purposes.  No trustee, examiner, or official committee has been appointed in these cases.  The Debtors are operating their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      Additional detail regarding the Debtors, their business, the events leading to commencement of these cases, and the facts and circumstances supporting the relief requested herein is set forth in the First Day Declarations and is incorporated herein by reference.

## SUMMARY OF THE DEBTORS' PRE-PETITION SECURED INDEBTEDNESS AND CERTAIN NOTES

6.      As of the Petition Date, the substantial majority of the Debtors' liabilities consisted of funded indebtedness.  None of the Debtors' funded indebtedness or equity is or was publicly offered for sale or publicly traded. As of the Petition Date, the debt obligations of the Debtors totaled in excess of $174 million including long-term debt of approximately $150 million, a revolving line of credit of $2.5 million and an accounts payable balance of approximately $14 million. The Debtors' capital structure comprises the following principal components:

(i)      **First Lien Debt**

7.      The Debtors, as borrowers, are party to that certain Credit Agreement dated as of January 26, 2017 (as amended, restated, supplemented, and otherwise modified from time to time, the "Prepetition First Lien Credit Agreement"), by and among True Health Diagnostics LLC, as a borrower, True Health Group LLC and its subsidiaries from time to time party thereto, the various financial institutions from time to time party thereto, as lenders, and Monroe Capital Management Advisors, LLC, as administrative agent (together with its permitted sub-agents, delegates, attorneys-in-fact, successors and assigns, including Monroe Capital LLC, the "Prepetition First Lien Administrative Agent") (and together with such lenders, the "Prepetition Secured Parties").  Pursuant to the Prepetition First Lien Credit Agreement, the Debtors obtained a senior secured financing facility as follows: (a) a revolving loan facility in an aggregate amount not to exceed $15,000,000 (the "Revolver") and (b) a term loan facility in an aggregate principal

amount not to exceed $110,000,000 (the "Term Loan" and, with the Revolver, the "Prepetition Credit Facilities").

8.      As security for the Debtors' repayment obligations under the Prepetition First Lien Credit Agreement, the Debtors granted the Prepetition First Lien Administrative Agent for the benefit of the Prepetition Secured Parties, first priority liens upon and senior security interests in (the "Prepetition Senior Liens") substantially all of the Debtors' property and assets (collectively, the "Prepetition Senior Collateral") as more particularly set forth in certain security documents and instruments, including but not limited to the (a) Guaranty and Collateral Agreement, dated as of January 26, 2017, by and among True Health Diagnostics LLC, and each other person signatory such agreement as a grantor, in favor of the Prepetition First Lien Administrative Agent; (b) Trademark Security Agreement, dated as of January 26, 2017, by True Health IP LLC, in favor of the Prepetition First Lien Administrative Agent; (c) Patent Security Agreement, dated as of January 26, 2017, by True Health IP LLC, in favor of the Prepetition First Lien Administrative Agent; (d) Copyright Security Agreement, dated as of January 26, 2017, by True Health IP LLC, in favor of the Prepetition First Lien Administrative Agent; (e) Limited Guaranty and Pledge Agreement, dated as of May 18, 2018, by THG Holdings LLC in favor of the Prepetition First Lien Administrative Agent; and (f) each Control Agreement (as defined in the Prepetition First Lien Credit Agreement).   On May 18, 2018, the Prepetition Secured Parties agreed to subordinate, subject to the conditions set forth in the Intercreditor Agreement (as defined below), $34,092,378.29 of the debt under the Prepetition Credit Facilities to be *pari passu* with Prepetition Second Lien Debt (as defined below).

9.      As of the Petition Date, the principal amounts outstanding under the Revolver and Term Loan are $2,786,744.81 and $118,805,633.48, respectively.[3]    Moreover, there is approximately $24,471.51 and $1,043,407.24 in accrued and unpaid interest under the Revolver and Term Loan, respectively.[4]

### (ii)    Second Lien Debt

10.     Additionally, True Health Diagnostics LLC and True Health Group LLC are borrowers, and Outreach Management Solutions LLC, Health Core Financial LLC, True Health Clinical LLC, and True Health IP LLC are guarantors to that certain Amended and Restated Second Lien Promissory Note, dated as of November 21, 2018 (the "Prepetition Second Lien Promissory Note"), with the lenders party thereto (the "Prepetition Second Lien Lenders"), and Riverside Strategic Capital Funds I, L.P., as agent (the "Prepetition Second Lien Administrative Agent" and, together with the Prepetition Second Lien Lenders, the "Prepetition Second Lien Parties").  The Prepetition Second Lien Promissory Note initially comprised of a loans in the original principal amount of $18,800,000.  As described above, on May 18, 2018, the Prepetition Secured Parties agreed to subordinate, subject to certain conditions set forth in the Intercreditor Agreement (as defined below), $34,092,378.29 to be *pari passu* with the Prepetition Second Lien Promissory Note. Between May 18, 2018 and the Petition Date, affiliates of the Prepetition Second Lien Administrative Agent funded an additional $15,530,000 to support the Debtors' operations.

---

[3]     Such amounts include payment-in-kind interest of $286,744.81 and $10,580,633.48 with respect to the Revolver and Term Loan, respectively, which pursuant to the Prepetition First Lien Credit Agreement is converted to principal.

[4]     Such amount does not include premiums, costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges and obligations owed by the Debtors due and payable under the Prepetition Credit Facility.

11.     As security for the repayment obligations under the Prepetition Second Lien Promissory Note, the borrowers and guarantors thereto granted the Prepetition Second Lien Administrative Agent, for the benefit of itself and the Prepetition Second Lien Lenders, certain second priority liens (the "Prepetition Second Liens" and together with the Prepetition Senior Liens, the "Prepetition Liens") on certain collateral (the "Prepetition Second Lien Collateral" and together with the Prepetition Senior Collateral, the "Prepetition Collateral").

### (iii)     Intercreditor Agreement

12.     The Debtors are party to that certain Intercreditor and Subordination Agreement, dated as of May 18, 2018, (as amended, restated, supplemented, or otherwise modified from time to time, the "Intercreditor Agreement") by and among the Debtors, True Health Group LLC, each of the entities listed as a guarantor thereto, Riverside Strategic Capital Fund I, L.P., and the other Subordinated Creditors (as defined in the Intercreditor Agreement), and Monroe Capital Management Advisors, LLC.  The Intercreditor Agreement was the result of efforts to restructure or sell the Debtors' business in fall 2017. It is pursuant to the Intercreditor Agreement that the Prepetition Secured Parties agreed to subordinate, subject to certain conditions set forth therein, $34,092,378.29 to be *pari passu* with the Prepetition Second Lien Promissory Note.

### (iv)     Other Trade and Miscellaneous Unsecured Debt

13.     The Debtors estimate that as of the Petition Date claims of other trade and miscellaneous unsecured creditors totaled approximately $14 million.

### THE DEBTORS' URGENT NEED FOR POSTPETITION FINANCING

14.     As a consequence of the factors described herein, and in the First Day Declarations, the Debtors have insufficient cash to continue to finance their operations, maintain business relationships with their vendors, suppliers, and customers, and to pay their employees. In order to complete their orderly sale process and maximize the value of their assets for the

benefit of their creditors and estates, the Debtors have an immediate need for the financing described in the Term Sheet and proposed Interim Order.  In the absence of the DIP Facility and the use of Cash Collateral, the orderly sale of the Debtors' business and assets would not be possible, and would cause serious and irreparable harm to the Debtors and their estates.

15.     Other than the DIP Facility, there are no superior financing alternatives available to the Debtors under the circumstances.  The Debtors are unable to obtain sufficient financing on more favorable terms than those set forth in the DIP Loan Documents, based on the totality of the circumstances.  After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time.

16.     Indeed, virtually all of the Debtors' assets are encumbered by liens and security interests granted to the Prepetition Secured Parties and the Prepetition Second Lien Parties (together, the "Prepetition Lenders").  Thus, even if alternative debtor in possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the DIP Lenders, the results of which could not be predicted with certainty.  Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, jeopardizing these cases.  Absent immediate availability of new credit, the Debtors will be forced to cease operations and the going-concern value of their business will be lost.

17.     Accordingly, the Debtors require the availability of working capital from the DIP Facility and the use of Cash Collateral.  The DIP Facility will provide more than just the ability for the Debtors to operate their business; the facility will instill a sense of confidence in the

Debtors' employees, customers, vendors, and other important stakeholders.    The Debtors critically need the support of these stakeholders at this time, as the loss of their support could severely impair the Debtors' ability to maximize the value of their estates.

18.    In sum, without the immediate access to the DIP Facility, the Debtors could suffer a cash shortage that would immediately and irreparably harm their estates and creditors. Furthermore, the Debtors will lack sufficient liquidity to meet expenses necessary for the continued operation of their business before the Final Hearing on this Motion can be held, and, therefore, it is essential that the Debtors obtain the proposed interim financing from the DIP Lenders.  The Debtors' ability to preserve the value of the Debtors' estates for the benefit of their creditors depends upon the interim and final relief requested in the Motion.

## SUMMARY OF THE DEBTORS' PROPOSED POST-PETITION FINANCING

19.    Pursuant to Bankruptcy Rule 4001(b) - (d), and Local Rule 4001-2(a), the following is a concise summary highlighting the proposed material terms of the Post-Petition Financing, as specified in the Term Sheet and Interim Order: [5]

| Material Provision | Summary Description of Material Provision |
|---|---|
| **DIP Credit Agreement Parties**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Term Sheet, at 1-2 | **Borrower**: True Health Diagnostics LLC.<br><br>**Guarantors**: The remaining Debtors.<br><br>**Lenders**: Certain of the Pre-Petition Secured Parties.<br><br>**Administrative Agent**: Monroe Capital Management Advisors, LLC. |

---

[5]    The summaries and descriptions of the terms and conditions of the DIP Facility and the proposed Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the Interim Order.  In the event there is a conflict between this Motion and the Interim Order, the Interim Order, as applicable, shall control in all respects.  All defined terms in this summary and description shall have the meanings proscribed to them in the Interim Order or the Term Sheet, as applicable.

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Amount**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Term Sheet, at 1 | The DIP Facility consists of a new money senior secured, superpriority, priming delayed draw term loan in a principal amount not to exceed $7,847,000. |
| **Use of Proceeds**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶ 23, Term Sheet, at 2 | The DIP Facility shall be used to fund amounts set forth in the post-petition budget (which shall be subject to approval by the DIP Agent and DIP Lenders, the "Budget"), including: (a) the payment of all accrued and budgeted administrative expenses prior to the Maturity Date (defined below), (b) upon consummation of a sale of all or substantially all of the Debtors' assets for a cash price greater than the DIP Loan amount, a post-sale budget in the amount of $200,000 to conduct an orderly wind down of the Debtors' estates, and (c) customary transaction fees and expenses (including accrued and unpaid expenses of DIP Agent and DIP Lenders) (collectively, the "Permitted Uses"); provided, however, except for the post-sale wind down budget of $200,000 described in (b) above, in no event will the DIP Lenders be obligated to advance more than the amounts set forth in the "Funding" line item of the Budget through the Maturity Date. |
| **Conditions of Closing and Borrowing**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Term Sheet, at 5-6 | Certain customary conditions precedent to extensions of credit, including, among other things, (i) entry into the Definitive Documentation; (ii) entry of the Interim Order as acceptable to the DIP Lenders; and (iii) entry of the Final Order within twenty-two (22) days of the Petition Date. Additionally, no later than twenty-two (22) days following the petition date, the Debtors must obtain an order of the Court or a stipulation among the Debtors and CMS, each in form and substance acceptable to the DIP Agent and DIP Lenders, directing CMS to continue payment of, or to resume post-petition reimbursements arising under the Debtors' pre-petition Medicare participation agreement(s) without deduction, offset or withholding of any kind or amount. Further, within thirty (30) days of the petition date, the Debtors must have obtained approval of the Court to retain the chief restructuring officer and investment banker. |
| **Sale Milestones**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Term Sheet, at 8-9 | The Debtors shall comply with the following sale and restructuring milestones:<br><br>1. The Debtors shall have filed on the petition date a motion to approve bidding procedures (which motion and procedures shall be in form and substance acceptable to the DIP Agent and DIP Lenders);<br><br>2. no later than twenty-five (25) days after the petition date, entry of an order of the Bankruptcy Court approving bidding and sale procedures which order and procedures shall be in form and substance acceptable to the DIP Agent and DIP Lenders and shall include, |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | among other provisions, a ruling that in connection with the sale of Debtors' assets, the DIP Agent and DIP Lenders are entitled to credit bid the full amount of their pre-petition claims under Section 363(k) of the Bankruptcy Code; |
| | 3. no later than fifty-five (55) days after the petition date, the Debtors shall have conducted an auction (if there are competing bids) and, if there is only one bidder, the Debtors shall have sought approval of the Bankruptcy Court to consummate the sale; |
| | 4. no later than fifty-eight (58) days after the petition date, the Debtors shall have obtained an order from the Bankruptcy Court authorizing a sale of the Debtors' assets, free and clear of all liens, claims, encumbrances and other interests; |
| | 5. within sixty (60) days after the petition date, the Debtors shall have consummated the sale and remitted the net proceeds thereof to the DIP Agent. |
| **DIP Financing Maturity Dates**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶¶ 1, 5 | The DIP Facility shall mature upon the earliest of: (w) September 28, 2019, (x) the date of consummation of a sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, (y) the effective date of any plan, or (z) termination by the DIP Agent (acting at the direction of DIP Lenders constituting more than 50% of the then outstanding loans and commitments with respect to the DIP Facility (the "Required DIP Lenders", provided that at all times there are two or more DIP Lenders that are not affiliates of each other, Required DIP Lenders will require two such DIP Lenders)) following the occurrence of an event of default (the "Maturity Date"). |
| **Interest Rate**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Term Sheet, at 4 | The DIP Facility shall accrue interest at a rate equal to LIBOR + 8.50 % per annum, which shall be payable monthly in cash on the last business day of each calendar month.  Default rate shall be an incremental 2% per annum. |
| **Fees**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Term Sheet, at 4 | **Agency Fee**. Same as under the Prepetition First Lien Credit Agreement; $100,000 per annum (which shall be fully earned upon entry of the Interim Order but payable on the Maturity Date).<br><br>**Closing Fee**. 2.5% of the commitments of the DIP Facility approved by the Court which shall be fully earned upon entry of the Interim DIP Order but payable on the Maturity Date. |
| **Events of Default**<br><br>Interim Order, ¶ 3(f) | Upon the occurrence of any of the following Events of Default (or Maturity Date), the obligations shall accelerate and become immediately due and |

| Material Provision | Summary Description of Material Provision |
|---|---|
| Fed. R. Bankr. P. 4001(c)(1)(B)(v), (x)<br><br>Interim Order, ¶ 5, Term Sheet, at 12-14 | payable and enforceable by the DIP Agent without further Court approval:<br><br>1. Any payment default by the Debtors under the DIP Facility.<br><br>2. Any breach of, or failure to achieve or adhere to a covenant, representation, warranty or milestone under the DIP Facility.<br><br>3. Any misrepresentation or omission by a Debtor in or with respect to the DIP Facility in any respect; provided that with respect to any representation by the Debtor relating to compliance with health care laws or regulations, the Debtors' representation shall be solely that the Debtors have not knowingly committed any violation of such laws or regulations.<br><br>4. Any Debtor's failure to comply with any requirement of the Interim DIP Order or Final DIP Order; provided that with respect to any representation by the Debtor relating to compliance with health care laws or regulations, the Debtors' representation shall be solely that the Debtors have not knowingly committed any violations of such laws or regulations.<br><br>5. Any variance of ten percent (10%) or more with respect to projected receipts and disbursements on a line item basis as reflected in the Budget, measured on a rolling two week basis; provided, however, that the 10% variance shall not apply to the payment of the DIP Agent's expenses, including professional fees and costs.<br><br>6. A failure by the Debtors, (a) within twenty-two (22) days after the petition date to have obtained an order of the Bankruptcy Court, or a stipulation among the Debtors and CMS, each in form and substance acceptable to the DIP Agent and DIP Lenders, directing CMS to pay or resume (as applicable) post-petition reimbursements arising under the Debtors' pre-petition Medicare participation agreement(s) without deduction, offset or withholding of any amount, and, thereafter (b) to maintain continuous and full participation in Medicare and to receive regular reimbursements from CMS under its Medicare participation agreement(s) without deduction, offset or withholding of any amount.<br><br>7. A failure by the Debtors, (a) within thirty (30) days after the petition date to have executed a written settlement or other agreement resolving all civil and criminal claims alleged by the United States Department of Justice and CMS (the "DOJ Settlement"), such settlement and resolution shall (i) be upon terms and conditions acceptable to the DIP Agent and DIP Lenders; and (ii) be subject only to Bankruptcy Court approval; |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | 8. Subject to entry of the Final DIP Order, in the event that DIP Lenders and DIP Agent decide to file a Chapter 11 plan as contemplated hereby, a failure by the Debtors to actively cooperate and support the DIP Agent and DIP Lenders in the formulation, drafting, filing, prosecution and consummation of the plan (and documents related thereto);<br><br>9. If at any time either the Debtors' investment banker or the DIP Agent and DIP Lenders reasonably conclude that no qualified parties are interested in purchasing all or substantially all of the Debtors' assets in one or more transactions on terms satisfactory to the DIP Agent and DIP Lenders prior to the Maturity Date.<br><br>10. The granting, creation or approval of any lien on Collateral *pari passu* or senior to the DIP Liens granted to the DIP Agent.<br><br>11. Dismissal of any of the bankruptcy cases or any successor case with respect to any Debtor or conversion of any Debtor bankruptcy case to a Chapter 7 case or the sale of substantially all of the assets of any Debtor without the advance written consent of the DIP Agent.<br><br>12. Any material adverse change in the business of the Debtors.<br><br>13. Failure of the Debtors to obtain extension of the time to the largest extent permitted by the Bankruptcy Code to assume or reject executory contracts and unexpired leases.<br><br>14. Termination or expiration of any Debtor's exclusive right to file a plan in the bankruptcy case.<br><br>15. Appointment of a chapter 11 trustee or examiner with expanded powers or other person with expanded powers in any of the bankruptcy cases.<br><br>16. Granting of relief from the automatic stay to permit foreclosure on assets of any Debtor with a value in excess of $100,000.<br><br>17. Reversal, vacation or stay of the effectiveness of the Final DIP Order.<br><br>18. Failure of any of the DIP Liens or DIP Superpriority Claims to be valid, perfected and enforceable in all respects.<br><br>19. Any failure of the board to adhere to the Approval Protocol.<br><br>Upon the declaration of an Event of Default, the Debtors shall have five days to cure such default or seek relief from the Court. |
| **Security and** | The liens securing all borrowings by the Debtors and other obligations of the |

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Priority Status**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(i)<br><br>Interim Order, ¶ 8, Term Sheet, at 9-10 | Debtors under the DIP Facility and loan documentation (and all guaranties) shall, subject to the Carve Out (as defined below) at all times:<br><br>a.  pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status in the Chapter 11 Cases (the "<u>DIP Superpriority Claims</u>");<br><br>b.  pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Debtors' estates in the Chapter 11 Cases that is not subject to valid, perfected and non-avoidable liens as of the commencement of the Case, excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (collectively, "<u>Avoidance Actions</u>"); <u>provided</u>, <u>however</u>, upon entry of the Final DIP Order, liens in favor of the DIP Agent and DIP Lenders shall attach to and be perfected in any proceeds of Avoidance Actions;<br><br>c.  pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Debtors' estates in the Chapter 11 Cases, that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, (other than property that is subject to the existing liens that secure obligations under the agreements referred to in clause (d) hereof, which liens shall be primed by the liens to be granted to the DIP Agent, for the benefit of itself and the DIP Lenders as described in such clause); and<br><br>d.  pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all of the property (such property, together with the property described in clauses (c) and (d) above, the "<u>DIP Collateral</u>") of the Debtors' estates in the Chapter 11 Cases (including, without limitation, inventory, accounts receivable, general intangibles, chattel paper, owned real estate, real property leaseholds, fixtures and machinery and equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements, and other intellectual property and capital stock of subsidiaries) that is subject to the existing liens that secure the obligations of any other lenders under or in connection with any existing credit agreement and related documents and agreements and all of which existing liens (the "<u>Primed Liens</u>") shall be primed by and made subject and subordinate to the perfected first priority senior liens to be granted to the DIP Agent, for the benefit of itself and the DIP Lenders, which senior priming liens in favor of the DIP Agent shall also prime any liens granted after the commencement of the |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | Chapter 11 Cases to provide adequate protection in respect of any of the Primed Liens, subject, in each case, only to the Carve Out (clauses (b), (c) and (d) collectively, the "DIP Liens").<br><br>All of the liens described above shall be effective and perfected as of the date the Bankruptcy Court enters an Interim DIP Order or the Final DIP Order, as the case may be, and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, in each case subject to the terms and conditions set forth in the Interim DIP Order or the DIP Order, as the case may be. |
| **Validity of Prepetition Liens**<br><br>Fed. R. Bankr. 4001(c)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(B)<br><br>Interim Order, ¶ | The Debtors' acknowledgements and stipulations set forth in Paragraph E of the Interim Order shall be binding upon entry of the Interim Order. Such findings include:<br><br>(a) all of the Prepetition Senior Obligations and Prepetition Second Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors and are unconditionally owing by the Debtors to the Prepetition Secured Parties and Prepetition Second Lien Parties, as applicable, and are not subject to any avoidance, reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity<br><br><br>(b) The Prepetition Senior Liens and the Prepetition Second Liens constitute valid, binding, enforceable, non-avoidable and perfected liens on all or substantially all of the Debtors' assets with priority over any and all other liens (other than Permitted Liens, as defined in the Prepetition First Lien Loan Documents) and are not subject to any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity. |
| **Cash Collateral**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B)<br><br>L.R. 4001-2(a)(ii)<br><br>Interim Order, ¶ 2, Term Sheet, at 9. | The Debtors will be permitted to use cash collateral in such amounts and for such purposes at such times as set forth in the Budget, subject to the adequate protection provisions provided in the Term Sheet and Interim Order. |
| **Adequate Protection** | The Prepetition Secured Parties shall be granted adequate protection in the form of (i) replacement liens (junior only to the DIP Liens and the Carve |

| Material Provision | Summary Description of Material Provision |
|---|---|
| Fed. R. Bankr. P. 4001(b)(1)(B)(iv), (c)(1)(B)(ii)<br><br>L.R. 4001-2(a)(ii)<br><br>Interim order, ¶¶ 12, 13, Term Sheet, at 11-12 | Out), including proceeds of all amounts owed to the company by CMS and liens on the proceeds of Avoidance Actions, but with respect to liens on the proceeds of Avoidance Actions only upon entry of a Final DIP Order, to the extent of any post-petition diminution in the value of the prepetition collateral securing the claims of the Prepetition Secured Parties (including the amount by which the Prepetition Secured Parties are subordinated to amounts outstanding under the DIP Facility) ("Senior Replacement Liens") and (ii) monthly reimbursement of professional fees and expenses, including fees and expenses of counsel.<br>The Prepetition Second Lien Lenders shall be granted adequate protection in the form of replacement liens (junior only to the DIP Liens, the Senior Replacement Liens and the Carve Out) on the same collateral supporting the Senior Replacement Liens to the extent of any post-petition diminution in the value of the collateral securing the claims of the Prepetition Secured Parties. |
| **Waiver of 506(c) and 552(b)**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(x)<br><br>Local Rule 4001(a)(i)(C),(H)<br><br>Interim Order, ¶ 19, 21 | 506(c) Waiver. The DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, and the Prepetition Secured Parties will each receive subject to entry of the Final Order in the case of the Prepetition Secured Parties, a waiver of the provisions of section 506(c) of the Bankruptcy Code.<br><br>Equities of the Case Waiver.  Subject to entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code. No person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the DIP Collateral or the Prepetition Collateral |
| **Carveout**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Local Rule 4002-2(a)(i)(F)<br><br>Interim Order, ¶ 11 | The "Carve Out" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, (ii) all unpaid professional fees and disbursements incurred by the Debtors and any statutory committees appointed in these Chapter 11 Cases prior to the occurrence of an Event of Default and notice thereof delivered to the Debtors, but only to the extent allowed by the Court at any time and only to the extent of amounts included in the Budget, provided, however, that notwithstanding the foregoing, with respect to SSG Advisors, LLC ("SSG"), the Carve Out shall include such transaction fees as may be agreed to by the Debtors, SSG, the DIP Agent and the DIP Lenders.  On a weekly basis, the budgeted fees for professionals shall be placed in escrow and released to each professional upon approval of the Court, and (iii) at any time after the occurrence of an Event of Default and notice thereof delivered to the Borrower, to the extent allowed at any time, whether before or after delivery of such notice, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid professional fees, costs and expenses (collectively, the "Professional Fees") |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | incurred by persons or firms retained by the Debtors and the committee and allowed by the Court, not in excess of $100,000 for the Debtors' professionals and the committee's professionals (the "Carve Out Cap"); provided, further, that the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent or the DIP Lenders or the DIP Agent or the DIP Lenders' professionals and nothing herein shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates. |
| **Indemnification** Fed. R. Bankr. P. 4001(c)(1)(B)(ix) Term Sheet, at 14 | The Debtors shall pay (a) all out-of-pocket expenses of the DIP Agent associated with the arrangement of the DIP Facility and the preparation, execution, delivery and administration of the Definitive Documentation and any amendment or waiver with respect thereto (including the fees, disbursements and other charges of counsels and financial advisors), (b) all out-of-pocket expenses of the DIP Agent and the DIP Lenders (including the reasonable fees, disbursements and other charges of counsels and financial advisors) in connection with the enforcement of the Definitive Documentation and (c) all other out-of-pocket expenses of the Prepetition Secured Parties (including, without limitation, the on-going monitoring of the Chapter 11 Cases, including attendance at hearings or other proceedings and the on-going review of documents filed with the Bankruptcy Court and the preparation of any and all pleadings). The DIP Agent and the DIP Lenders (and their affiliates and their respective officers, directors, employees, partners, members, counsel, professionals, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of the indemnified party. |
| **Right to File Plan** Fed. R. Bankr. P. 4001(c)(1)(B)(v) Term Sheet, at 8. | Subject to the entry of the Final DIP Order, at any time following entry of the Final DIP Order, the DIP Agent and DIP Lenders may propose a Chapter 11 plan for one or more of the Debtors whereby, among other terms, claims arising under the Prepetition First Lien Credit Agreement will be reduced to $50 million and satisfied by (i) the creation of a new year secured term loan facility, and (ii) the issuance of new equity interests in the reorganized Debtors to the holders of such claims.  Under the Final DIP Order, the Debtors' rights under Section 1121(b) of the Bankruptcy Code shall be modified to allow the DIP Agent and DIP Lenders to propose and prosecute such plan. |
| **Modification of the** | The automatic stay provisions of section 362 of the Bankruptcy Code are, to |

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Automatic Stay**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv)<br><br>Interim Order, ¶ 18 | the extent applicable, vacated and modified without further application or motion to, or order from, the Court, to the extent necessary to effectuate the terms of the Interim Order. |
| **Releases**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(viii)<br><br>Interim Order, ¶ 17 | The Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in these Chapter 11 Cases or any Successor Case) forever and irrevocably  (a) release, discharge, and acquit the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, the Prepetition Secured Parties and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any claims arising from any actions relating to any aspect of the relationship between the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent or the Prepetition Secured Parties, on the one hand, and the Debtors and their affiliates, on the other hand, including any equitable subordination claims or defenses, with respect to or relating to the Prepetition Senior Obligations, the Prepetition Senior Liens, the Prepetition First Lien Loan Documents, the DIP Facility, the DIP Liens, the DIP Loan Documents, any and all claims and causes of action arising under title 11 of the United States Code, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the Prepetition First Lien Administrative Agent and the Prepetition Secured Parties; and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the Prepetition Senior Obligations and the Prepetition Senior Liens. |

## REQUEST FOR APPROVAL OF PROPOSED POST-PETITION FINANCING

20.     The Debtors' continuing viability, ability to maximize the value of their estates for the benefit of their creditors, and their ability to pursue the sale of their assets as going concerns depends heavily upon the expeditious approval of the DIP Facility and the related actions requested herein.

21.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security.  If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to Section 364(c) of the Bankruptcy Code,[6] a court may authorize a debtor in possession to obtain credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or combination of the foregoing.  Pursuant to section 364(d) of the Bankruptcy Code,[7] a court may authorize a debtor in possession to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is already subject to a lien.

22.     As a condition to entering into the DIP Facility and obtaining the Debtors' needed liquidity, the Debtors must obtain authorization, pursuant to sections 364(c) and (d) of the Bankruptcy Code, to grant (a) the DIP Lenders automatically perfected security interests in and liens upon all of the DIP Collateral and (b) allowed superpriority administrative expense claims to the DIP Agent and the DIP Lenders.

---

[6]     Section 364(c) of the Bankruptcy Code provides as follows:
>    If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>    (1) with priority over any or all administrative expenses of the kind specified in section 503 (b) or 507 (b) of this title;
>    (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>    (3) secured by a junior lien on property of the estate that is subject to a lien.
>    11 U.S.C. § 364(c).

[7]     Section 364(d) of the Bankruptcy Code provides as follows:
>    (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>    (A) the trustee is unable to obtain such credit otherwise; and
>    (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>    11 U.S.C. § 364(d).

A.      **Approval Under Section 364(c) of the Bankruptcy Code**

23.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense." *See In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "although a debtor is not required to seek credit from every possible source, a debtor must show that it has made a reasonable effort to seek other sources of credit available under section 364(a) & (b)"); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

B.      **The Debtors Were Unable to Obtain Necessary Post-Petition Financing on an Unsecured Basis under 11 U.S.C. § 364(a) or (b).**

24.     As set forth in the First Day Declarations, the Debtors could not have obtained a working capital facility of the type and magnitude required in these cases on an unsecured basis.

25.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* at 1088; *see also Ames*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the

least onerous financing option from the remaining two lenders).  Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

26.     Other than the proposed DIP Facility, there are no viable financing alternatives available to the Debtors under the circumstances.  For a number of reasons, including the current state of the financial markets, the nature and state of the Debtors' business operations, the immediacy of the Debtors' financing needs, and the liens of the DIP Lenders on the Prepetition Collateral, the Debtors are convinced that other than the proposed DIP Facility they would be entirely unable to obtain financing to address their urgent liquidity needs.

27.     Moreover, as noted above, virtually all of the Debtors' assets are encumbered by liens and security interests granted to the DIP Lenders.  Thus, even if alternative debtor in possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the DIP Agent and the DIP Lenders, the results of which could not be predicted with certainty.  Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, immediately jeopardizing their chapter 11 cases at the outset.

## C.     Approval of Priming Liens

28.     If a debtor in possession is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor in possession may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien."  11 U.S.C. § 364(d).  Section 364(d) of the Bankruptcy Code, which governs the

incurrence of postpetition debt secured by priming liens, provides that the court, after notice and hearing, may authorize the debtor in possession to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

29.     As discussed above, there is a lack of financing available to the Debtors in light of the circumstances.  Accordingly, and given the state of the credit markets, the Debtors have concluded that financing comparable to that provided by the DIP Lenders under the DIP Facility is currently unobtainable without the priming of the Prepetition Liens.  *See In re Utah 7000, L.L.C.*, 2008 WL 2654919, *2 (Bankr. D. Utah July 3, 2008) (finding debtor unable to obtain financing without priming of Pre-Petition liens); *In re Mosello*, 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996) (same); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (same); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (same).

30.     It should be noted that the only liens that are being primed are the prepetition liens of the Prepetition Lenders, who consent to the priming of such liens.  In these circumstances, the Debtors, in the exercise of their considered business judgment and in consultation with their professional advisors, have determined that the financing provided by the DIP Facility is the most favorable under the circumstances and provides the Debtors necessary liquidity to maintain the going concern value of their business pending the conclusion of the Debtors' proposed sale process.

**D.**     **The Loans Under the Post-Petition Financing are Necessary to Preserve Assets of the Debtors' Estates**

31.     It cannot reasonably be disputed that the Debtors have an immediate need for access to a working capital facility.  Without the DIP Facility, the Debtors will be unable to pursue a going-concern sale of substantially all of their assets, resulting in irreparable harm to the Debtors' estates.  Further, the DIP Facility is essential so that the Debtors can immediately instill their employees, suppliers and customers with confidence in the Debtors' ability to meet their obligations to these important stakeholders.  If this Motion is denied or delayed, that confidence may be destroyed, and the success of these chapter 11 cases might be irreparably damaged. Absent such confidence, the Debtors will not have the resources or support necessary to maintain operations and preserve their value as a going concern.  The Debtors' need for access to the DIP Facility is, therefore, immediate.

**E.**     **Application of the Business Judgment Standard**

32.     After appropriate and extensive investigations and analysis, and robust, good faith, and arm's length negotiations, the Debtors concluded that the proposed DIP Facility and the use of cash collateral is the best alternative available in the circumstances of these cases. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment on behalf of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); *In re TM Carlton House Partners, LTD*, 91 B.R. 349, 357 (Bankr. E.D. Pa. 1988) (holding that due to the debtor's distinct awareness of its own financial needs, the court would not second-guess its business judgment to put aside cash to

effectuate a refinancing of its debts); *cf. Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding the rejection or assumption of a lease is left to the business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus. Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

33.     The terms of the DIP Facility are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the DIP Facility and obtain funds from the DIP Lenders on the secured, administrative "superpriority" basis described above, pursuant to sections 364(c) and (d) of the Bankruptcy Code.

## REQUEST FOR USE OF CASH COLLATERAL

34.     The Debtors will require the ability to use cash and the proceeds of existing accounts receivable and inventory to maintain the operation of their business and preserve their value as going concerns. These essential assets, however, constitute part of the Prepetition Collateral, and the Prepetition Lenders are entitled to adequate protection of their respective interests in the Prepetition Collateral pursuant to section 363(c)(2) of the Bankruptcy Code.

35.     Section 363(c)(2) of the Bankruptcy Code provides that:

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorized such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

36.     In the instant cases, the Prepetition Lenders have consented to the Debtors' use of the Cash Collateral, and such use is essential to the preservation of the Debtors' estates. Accordingly, the Court should approve the Debtors' use of Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

## <u>APPROVAL OF ADEQUATE PROTECTION</u>

37.     In exchange for the Debtors' use of the Prepetition Collateral, including the Cash Collateral, and the priming of the Prepetition Liens, the Prepetition Lenders are entitled to receive adequate protection pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any diminution in the value of each of its respective interests in the Prepetition Collateral (including the Cash Collateral) resulting from the Debtors' use, sale, or lease (or other decline in value) of such collateral, the imposition of the automatic stay, the priming of the Prepetition Liens on the Prepetition Collateral, and the subordination to the Carve Out (collectively, and solely to the extent of any such diminution in value, the "<u>Diminution in Value</u>").

38.     The Debtors propose to provide the Prepetition Lenders with adequate protection in accordance with sections 361, 363, and 364 of the Bankruptcy Code.  To that end, the Debtors, and the Prepetition Lenders have negotiated, and the Debtors request the Court approve, as of the Petition Date, certain protections of the Prepetition Lenders' interests in the Prepetition Collateral from any diminution in value of each of their respective interests in the Prepetition

Collateral. Such adequate protection, as described more fully in the Interim Order, is summarized below.

> (i) The Prepetition Secured Parties shall be granted adequate protection in the form of (i) replacement liens (junior only to the DIP Liens and the Carve Out), including proceeds of all amounts owed to the company by CMS and liens on the proceeds of Avoidance Actions, but with respect to liens on the proceeds of Avoidance Actions only upon entry of a Final DIP Order, to the extent of any post-petition diminution in the value of the prepetition collateral securing the claims of the Prepetition Secured Parties (including the amount by which the Prepetition Secured Parties are subordinated to amounts outstanding under the DIP Facility) ("Senior Replacement Liens") and (ii) monthly reimbursement of professional fees and expenses, including fees and expenses of counsel; and

> (ii) The Prepetition Second Lien Parties shall be granted adequate protection in the form of replacement liens (junior only to the DIP Liens, the Senior Replacement Liens and the Carve Out) on the same collateral supporting the Senior Replacement Liens to the extent of any post-petition diminution in the value of the collateral securing the claims of the Prepetition Secured Parties.

39.    The Debtors believe that the proposed adequate protection is fair and reasonable. The Prepetition Lenders have agreed that the adequate protection summarized above and provided for in the Interim Order is sufficient to allow the Debtors to use their Cash Collateral. Furthermore, the priming of the Prepetition Liens will enable the Debtors to obtain postpetition financing offered by the DIP Facility. As a result, the Prepetition Lenders consent to such priming liens and are entitled to receive adequate protection of their interest in their respective interests in the Prepetition Collateral. However, nothing herein or in the Interim Order shall affect or impair the Prepetition Lenders' rights to seek additional adequate protection of its interests.

40.    Accordingly, based on the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide certain adequate protections in accordance with the terms set forth in the Interim Order.

## THE DEBTORS SHOULD BE PERMITTED TO MAKE
## INTERIM BORROWINGS UNDER THE POST-PETITION FINANCING

41.    This Court is empowered to conduct a preliminary expedited hearing on this Motion and authorize the Interim Order.  Specifically, Bankruptcy Rule 4001(c) governs the procedures for securing authorization to obtain debtor in possession financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c).

42.    Pending the Final Hearing, the Debtors require $3,574,000 under the DIP Facility for, inter alia, ongoing liquidity, payment of vital services and other working capital needs.  It is essential that the Debtors immediately stabilize their operations and resume paying for ordinary, postpetition operating expenses in order to preserve the value of the Debtors' estates for the benefit of all of the Debtors' creditors and equity holders.  Additionally, without the liquidity provided by the ability to access the postpetition financing as needed in the interim period, suppliers, vendors and employees may begin to doubt the ability of the Debtors to pay administrative expenses as they come due—a potential death knell to these cases.

43.    Consequently, if interim relief is not obtained, the Debtors, their estates, their creditors and equity holders, their business, their employees, and their assets will suffer immediate and irreparable harm.

44.    Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 14-day period following the filing of a motion requesting authorization to obtain Post-Petition financing "only to the extent necessary to avoid immediate and irreparable

harm to the estate pending a final hearing."  Bankruptcy Rule 4001(c)(2).  The Debtors' current financial distress and need for post-petition liquidity, provides ample evidence to support the conclusion that the Debtors will avoid immediate and irreparable harm only if the Court authorizes the relief requested by this Motion.

45.     Given the immediate and irreparable harm to be suffered by the Debtors absent interim relief, the Debtors respectfully request that the Court schedule and conduct a preliminary hearing on the Motion and (a) authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the Term Sheet and Interim Order and to utilize Cash Collateral, and (b) schedule the Final Hearing.

## **GOOD FAITH**

46.     The Debtors submit that the terms and conditions of the DIP Facility, and the fees paid and to be paid thereunder, are the best available to the Debtors under the circumstances.  As stated above, the Debtors and the DIP Agent negotiated the terms and conditions of the DIP Facility and the use of Cash Collateral in good faith and at arm's length.  Moreover, the Debtors' decision to enter into the DIP Facility was an exercise of the Debtors' prudent business judgment.  Therefore, the DIP Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Facility, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## **REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY**

47.     The Interim Order contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code, to the extent necessary, to permit the Prepetition Secured Parties and the DIP Agent to exercise all rights and remedies provided for in the Prepetition First Lien Credit Agreement, Prepetition Second Lien Promissory Note, the DIP

Documents, the Interim Order and the Final Order, and to take various actions without further order of or application to the Court.

48.     Stay modification provisions of this type are customary features of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the Interim Order.

## REQUEST TO WAIVE BANKRUPTCY RULES 6003(B), 6004(A), AND 6004(H)

49.     In order to successfully implement the foregoing, the Debtors respectfully request that the Court waive the notice requirements provided for by Bankruptcy Rule 6004(a), the twenty-one day stay provided for by Bankruptcy Rule 6003(b), and the fourteen-day stay provided for by Bankruptcy Rule 6004(h).  The Debtors believe, for the reasons set forth above, that ample justification exists for the Court to waive Bankruptcy Rule 6003(b), 6004(a), and 6004(h).

## REQUEST FOR FINAL HEARING

50.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request the Court to set a date for the Final Hearing that is no later than 21 days from the Petition Date.

## NOTICE

51.     Notice of this Motion will be provided to:  (i) the Office of the United States Trustee; (ii) the Internal Revenue Service; (iii) the Securities and Exchange Commission; (iv) the Delaware Secretary of State; (v) the Delaware Secretary of the Treasury; (vi) the Debtors' thirty (30) largest unsecured creditors; (vii) counsel to Monroe Capital Management Advisors, as administrative agent to the postpetition lenders; (viii) counsel to Riverside Strategic Capital Fund; (ix) counsel to Silverpoint Capital; (x) the United States Department of Health and Human Services and the Centers for Medicare and Medicaid Services; and (xi) all parties requesting

notice pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **NO PRIOR REQUEST**

52.     No prior request for the relief sought in the Motion has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order substantially in the form of the Interim Order annexed hereto as Exhibit C; (ii) schedule the Final Hearing, (iii) after the Final Hearing, enter a Final Order substantially in the form of the Interim Order and as filed with the Court prior to the Final Hearing; and (iv) grant such other and further relief as is just and proper.

Dated: July 30, 2019                MORRIS, NICHOLS, ARSHT & TUNNELL LLP
      Wilmington, Delaware

*/s/ Derek C. Abbott*
Derek C. Abbott (No. 3376)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Tamara K. Mann (No. 5643)
Matthew O. Talmo (No. 6333)
Paige Topper (No. 6470)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
dabbott@mnat.com
cmiller@mnat.com
dbutz@mnat.com
tmann@mnat.com
mtalmo@mnat.com
ptopper@mnat.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

## EXHIBIT A

**TERM SHEET**

## TRUE HEALTH DIAGNOSTICS LLC

### Debtor-in-Possession Financing Term Sheet
### July 30, 2019

| | |
|---|---|
| **Borrower:** | True Health Diagnostics LLC, a Delaware limited liability company (the "Borrower"), a debtor and debtor-in-possession under Chapter 11 of the United States Bankruptcy Code. |
| **Guarantors:** | Same as under that certain Credit Agreement, dated as of January 26, 2017, by and among the Borrower, True Health Group LLC, a Delaware limited liability company ("Holdings"), the other subsidiaries of Holdings from time to time party thereto, the various financial institutions from time to time party thereto, as lenders, and the Prepetition First Lien Administrative Agent (as defined below) (together with such lenders, "Prepetition Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition First Lien Credit Agreement") and THG Holdings LLC, a Delaware limited liability company ("Parent"), each of which is a debtor and debtor-in-possession under Chapter 11 of the United States Bankruptcy Code (together with the Borrower, collectively, the "Debtors", and each individually, a "Debtor"). The obligations of the Debtors under the DIP Facility shall be joint and several. The guaranty provisions set forth in Annex B hereto are hereby incorporated herein by reference. |
| **DIP Facility:** | The DIP Facility shall consist of a new money senior secured, superpriority, priming debtor-in-possession delayed draw term loan (the "DIP Loan") in a principal amount not to exceed $7,847,000 million to be funded as set forth below ("DIP Facility"). |
| **DIP Lenders:** | Certain of the Prepetition Secured Parties as set forth on Annex C hereto (from and after consummation of the DIP Facility, the "DIP Lenders"). |
| **Administrative Agent** | Monroe Capital Management Advisors, LLC ("DIP Agent"). |
| **Term/Maturity:** | The DIP Facility shall mature upon the earliest of: (w) September 28, 2019, (x) the date of consummation of a sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, (y) the effective date of any plan, or (z) termination by the DIP Agent (acting at the direction of DIP Lenders constituting more than 50% of the then outstanding loans |

|  | and commitments with respect to the DIP Facility (the "<u>Required DIP Lenders</u>", provided that at all times there are two or more DIP Lenders that are not affiliates of each other, Required DIP Lenders will require two such DIP Lenders)) following the occurrence of an event of default (the "<u>Maturity Date</u>"). |
|---|---|
| **Amortization:** | None. |
| **Security:** | Subject to the Carve-Out, the DIP Facility shall be secured by a Bankruptcy Court-approved superpriority, priming lien on substantially all assets of the Debtors;    provided, however, liens against the proceeds of Avoidance Actions (as defined below) shall be subject to the entry of the Final DIP Order. |
| **Use of Proceeds:** | The DIP Facility shall be used to fund amounts set forth in the post-petition budget (which shall be subject to approval by the DIP Agent and DIP Lenders, the "<u>Approved Budget</u>"), including: (a) the payment of all accrued and budgeted administrative expenses prior to the Maturity Date, (b) upon consummation of a sale of all or substantially all of the Debtors' assets for a cash price greater than the DIP Loan amount, a post-sale budget in the amount of $200,000 to conduct an orderly wind down of the Debtors' estates, and (c) customary transaction fees and expenses (including accrued and unpaid expenses of DIP Agent and DIP Lenders) (collectively, the "<u>Permitted Uses</u>"); provided, however, except for the post-sale wind down budget of $200,000 described in (b) above, in no event will the DIP Lenders be obligated to advance more than the amounts set forth in the "Funding" line item of the Approved Budget through the Maturity Date. |
| **DIP Facility Covenants:** | Notwithstanding anything set forth herein to the contrary, including under the Section titled "Certain Documentation Matters," the negative covenants shall be as set forth on Annex A hereto, which is incorporated herein by reference, and for the avoidance of doubt, the negative covenants set forth in Section 11 of the Prepetition First Lien Credit Agreement shall not apply. |
|  | The affirmative covenants shall be as set forth in the Prepetition First Lien Credit Agreement, provided, however, that (x) affirmative covenants 10.1.3 and 10.1.10 shall not apply, (y) affirmative covenant 10.4(d) shall be subject to Bankruptcy Court approval or otherwise in accordance with applicable law, provided that this covenant shall not apply to 2018 and 2019 personal property taxes from the City of Richmond, and (z) permitted uses as provided in affirmative covenant 10.6 shall include (and be limited to) the Permitted Uses; and provided further, however, that with respect to any representation by the Debtors relating to compliance |

2

with health care laws or regulations, the Debtors' representation shall be solely that the Debtors have not knowingly committed any violation of such laws or regulations.

In addition, the following affirmative covenants shall apply:

(1) on Tuesday of each week, the Debtors shall furnish the DIP Agent and DIP Lenders a detailed actual-to-budget variance report reflecting the Debtors' receipts, disbursements on a line item basis and financial performance for the previous weekly period, in form and substance acceptable to the Required DIP Lenders; provided that if the week begins with a federal holiday the variance report shall be provided to the DIP Agent and DIP Lenders on the second day following the federal holiday,

(2) continue to retain a chief restructuring officer acceptable to the DIP Agent and DIP Lenders with such duties and scope of authority as may be acceptable to the DIP Agent and DIP Lenders,

(3) pass and maintain a resolution of the board requiring the recommendation of the chief restructuring officer before any material decisions of any of the Debtors may become effective (the "Approval Protocol") including without limitation the following matters:  (i) the administration and conduct of the Chapter 11 proceedings, (ii) the direction and control of the prosecution and/or settlement of actions against the Centers for Medicare & Medicaid Services ("CMS") including an action to compel or cause the continuation, commencement or resumption of funding by CMS, (iii) to resolve claims asserted by the Department of Justice against the Debtors, and (iv) the direction, control, approval and consummation of any sale of material assets of the Debtors. Notwithstanding the foregoing, (x) with respect to the non-economic aspects of any settlement of criminal matters by or on behalf of the Debtors such chief restructuring officer recommendation or approval shall not be required and (y) the rights of the Subordinated Lenders or any of their affiliates as holders of claims and/or of equity security interests shall be preserved without prejudice and be exercisable as permitted by applicable law or agreement,

(5) continue to maintain appointment of an investment banker, on terms and conditions reasonably acceptable to the DIP Agent and DIP Lenders, for the purposes of conducting a sale process for the sale of the Borrower's business as a going concern in accordance with the sale milestones set forth herein,

(6) in good faith, file and prosecute any actions or proceedings as may be reasonably necessary to compel CMS to resume reimbursements to the Debtors during the pendency of the Chapter

| | |
|---|---|
| | 11 case, and |
| | (7) afford the DIP Agent and DIP Lenders reasonable access to the chief restructuring officer, the board and investment banker as and when reasonably requested for such information, updates and other purposes as the DIP Agent and DIP Lenders may reasonably determine; provided that, without limiting the forgoing, each of the chief restructuring officer and the investment banker will hold required status calls with the DIP Agent and the DIP Lenders no less frequently than weekly. |
| **Interest Rate:** | The DIP Facility shall accrue interest at a rate equal to LIBOR + 8.50 % per annum, which shall be payable monthly in cash on the last business day of each calendar month.  Default rate shall be an incremental 2% per annum. |
| **Agency Fee:** | Same as under the Prepetition First Lien Credit Agreement; $100,000 per annum (which shall be fully earned upon entry of the Interim DIP Order but payable on the Maturity Date). |
| **Closing Fee:** | 2.5% of the commitments of the DIP Facility approved by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") which shall be fully earned upon entry of the Interim DIP Order but payable on the Maturity Date. |
| **Mandatory Prepayments:** | Usual and customary for loans of this nature, including (i) 100% of the net cash proceeds from the incurrence of indebtedness (other than all permitted indebtedness to be agreed); and (ii) 100% of the net cash proceeds of any sale or other disposition of any Collateral or other assets of the Debtors. |
| **Definitive Documentation:** | This term sheet shall be subject to the negotiation and execution of customary definitive documentation, including, without limitation, a credit agreement for the Final DIP Order, the Approved Budget and appropriate orders of the Bankruptcy Court as is customary for a senior secured, priming debtor-in-possession financing. |
| **Conditions Precedent**: | As conditions precedent to the DIP Lender's obligation to fund the DIP Facility or any part thereof: |
| | (1) the entry by the Bankruptcy Court of : |
| | (a) no later than two (2) days after the petition date, an interim order (the "Interim DIP Order"), in form and substance acceptable to the DIP Agent and DIP Lenders in their sole discretion, *inter alia*, approving the DIP Facility on an interim basis, and authorizing the Debtors to grant the DIP Agent, for the benefit of itself and the DIP Lenders, valid, duly perfected priming senior priority liens and superiority administrative expense claims and |

such interim period shall last no more than twenty-one (21) days following the petition date, and

(b) no later than twenty-two (22) days following the petition date, a final order of the Bankruptcy Court, in form and substance acceptable to the DIP Agent in its sole discretion, approving the Definitive Documentation, and, *inter alia*, authorizing the Debtors to enter into the Definitive Documentation and granting the DIP Agent, for the benefit of itself and the DIP Lenders, valid, duly perfected priming senior priority liens as set forth herein and superiority administrative expense claims as set forth herein on a final basis (the "Final DIP Order" and together with the Interim DIP Order, the "DIP Orders");

(2) within one day after the entry of the Final DIP Order, the Definitive Documentation shall have been entered into consistent with this Debtor-in-Possession Financing Term Sheet in form and substance acceptable to the DIP Agent in its sole discretion;

(3) all conditions precedent to the funding of the DIP Facility shall have been satisfied;

(4) no later than twenty-two (22) days following the petition date, the Debtors shall have obtained an order of the Bankruptcy Court, or a stipulation among the Debtors and CMS, each in form and substance acceptable to the DIP Agent and DIP Lenders, directing CMS to continue payment of, or to resume post-petition reimbursements arising under the Debtors' pre-petition Medicare participation agreement(s) without deduction, offset or withholding of any kind or amount;

(5) within 30 days of the petition date, the Debtors shall have obtained approval of the Bankruptcy Court to retain the chief restructuring officer, having such duties and authority as may be acceptable to the DIP Agent and DIP Lenders including, without limitation, the broadest possible authority consistent with that of a chief executive officer, to direct the filing and prosecution of a Chapter 11 proceeding, to direct and control the prosecution and/or settlement of actions against CMS, to compel continuation or cause the commencement of funding by CMS, to resolve the claims of the Department of Justice against the Debtors, and to direct, control and consummate the sale of the Debtors' business as going concern in accordance with the sale milestones set forth herein;

(6) within 30 days of the petition date, the Debtors shall have obtained approval of the Bankruptcy Court to retain the investment banker retained prepetition for the purposes of conducting a sale process for the sale of the Debtors' business as a going concern;

(7) prior to the petition date, True Health Diagnostics LLC shall

5

| | |
|---|---|
| | have delivered WARN Act notices to their employees as required by law (such notices shall have been furnished to counsel for the DIP Agent and DIP Lenders for comment before distribution); and |
| | (8) satisfaction of such other terms, conditions, and milestones as may be agreed or as otherwise set forth herein. |
| **Borrowing Mechanics** | Borrowing mechanics shall be consistent with the borrowing of revolving loans under the Prepetition First Lien Credit Agreement, provided that: |
| | (1) Once repaid, DIP Loans may not be reborrowed. |
| | (2) No more than $3,574,000 of DIP Loans shall be available for borrowing prior to entry of the Final DIP order. |
| | (3) Borrowing requests for DIP Loans may not be submitted more than once per calendar week and all borrowing requests shall be made in accordance with the Approved Budget in effect at such time. |
| | (4) Provided that with respect to any representation by the Debtors relating to compliance with health care laws or regulations, the Debtors' representation shall be solely that the Debtors have not knowingly committed any violation of such laws or regulations. |
| | (5) The following representations in the Prepetition First Lien Credit Agreement shall be modified as follows: |
| | (a) 9.2 and 9.3 shall be subject to entry of the DIP Orders. |
| | (b) 9.5 shall be replaced in its entirety with the following language: "Since June 30, 2019, there has been no material adverse change in the financial condition, operations, assets, business, or properties of the Loan Parties and their Subsidiaries, taken as a whole; provided that, for purposes of this Agreement, "Material Adverse Effect" means (a) a material adverse change in or a material adverse effect upon, the financial condition, operations, assets, business, or properties of the Loan Parties taken as a whole, (b) a material impairment of the ability of any Loan Party to perform any of the Obligations under any Loan Document, (c) a material adverse effect upon any substantial portion of the Collateral under the Collateral Documents or upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document, or (d) a material impairment of the ability of Administrative Agent to enforce or collect any Obligations or to realize upon any Collateral except for such effect that results or resulted from the |

commencement of the Chapter 11 Cases and the events that customarily and reasonably result from events leading up to and following the commencement of the Chapter 11 Cases."

(c) 9.6 shall be limited to post-petition liabilities.

(c) the term "liens" used in 9.7 and 9.32 shall not include the liens granted pursuant to this Debtor-in-Possession Financing Term Sheet, the Definitive Documentation, or the DIP Orders.

(e) 9.13 shall be subject to approval of the Bankruptcy Court or otherwise in accordance with applicable law provided that this representation shall not apply to 2018 and 2019 personal property taxes from the City of Richmond.

(d) 9.14 shall be inapplicable.

(d) the representation with respect to the WARN Act or similar state law in section 9.23 shall be inapplicable.

(d) 9.24 shall be inapplicable.

(e) 9.27 shall be made solely with respect to the liens granted pursuant to this Debtor-in-Possession Financing Term Sheet, the Definitive Documentation, or the DIP Orders.

(f) the reference to Closing Date in 12.1 shall refer to the Closing Date in the Prepetition First Lien Credit Agreement.

(6) Borrower shall give written notice in form and substance acceptable to the DIP Agent of each proposed borrowing not later than 10:00 a.m. (Chicago time) three business days prior to the proposed date of that borrowing (provided, however, with respect to the proposed borrowing of a DIP Loan on the Closing Date, such notice shall be given not later than 10:00 a.m. (Chicago Time) one business day prior to the proposed date of that borrowing). Each such notice will be effective upon receipt by DIP Agent, will be irrevocable, and must specify the date and amount of borrowing. On the requested borrowing date, each DIP Lender shall provide DIP Agent with immediately available funds, to the account specified by the DIP Agent covering that DIP Lender's pro rata share of that borrowing so long as the applicable DIP Lender has not received written notice that the conditions precedent set forth herein with respect to that borrowing have not been satisfied. After DIP Agent's receipt of the proceeds of the applicable DIP Loans from the DIP Lenders, DIP Agent shall make the proceeds of those DIP Loans available to Borrower on the applicable

| | |
|---|---|
| | borrowing date by transferring to Borrower immediately available funds equal to the proceeds received by DIP Agent. |
| **Sale/Restructuring Milestones** | The Debtors shall comply with the following sale and restructuring milestones:<br><br>1. Debtors shall have filed on the petition date a motion to approve bidding procedures (which motion and procedures shall be in form and substance acceptable to the DIP Agent and DIP Lenders);<br><br>2. no later than twenty-five (25) days after the petition date, entry of an order of the Bankruptcy Court approving bidding and sale procedures which order and procedures shall be in form and substance acceptable to the DIP Agent and DIP Lenders and shall include, among other provisions, a ruling that in connection with the sale of Debtors' assets, the DIP Agent and DIP Lenders are entitled to credit bid the full amount of their pre-petition claims under Section 363(k) of the Bankruptcy Code;<br><br>3. no later than fifty-five (55) days after the petition date, the Debtors shall have conducted an auction (if there are competing bids) and, if there is only one bidder, the Debtors shall have sought approval of the Bankruptcy Court to consummate the sale;<br><br>4. no later than fifty-eight (58) days after the petition date, the Debtors shall have obtained an order from the Bankruptcy Court authorizing a sale of the Debtors' assets, free and clear of all liens, claims, encumbrances and other interests;<br><br>5. within sixty (60) days after the petition date, the Debtors shall have consummated the sale and remitted the net proceeds thereof to the DIP Agent.<br><br>6. Subject to the entry of the Final DIP Order, at any time following entry of the Final DIP Order, the DIP Agent and DIP Lenders may propose a Chapter 11 plan for one or more of the Debtors whereby, among other terms, claims arising under the Prepetition First Lien Credit Agreement will be reduced to $50 million and satisfied by (i) the creation of a new secured term loan facility, and (ii) the issuance of new equity interests in the reorganized Debtors to the holders of such claims. Under the Final DIP Order, the Debtors' rights under Section 1121(b) of the Bankruptcy Code shall be modified to allow the DIP Agent and DIP Lenders to propose and prosecute such plan. |

| Use of Cash Collateral | The Debtors will be permitted to use cash collateral in such amounts and for such purposes at such times as set forth in the Approved Budget, subject to the adequate protection provisions as described below. |
|---|---|
| **Priority and Liens:** | (1)     The liens securing all borrowings by the Debtors and other obligations of the Debtors under the DIP Facility and loan documentation (and all guaranties) shall, subject to the Carve-Out (as defined below) at all times: |

<div style="margin-left:2em">

a.      pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status in the Chapter 11 Cases (the "<u>DIP Superpriority Claims</u>");

b.      pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Debtors' estates in the Chapter 11 Cases that is not subject to valid, perfected and non-avoidable liens as of the commencement of the Chapter 11 Cases, excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (collectively, "<u>Avoidance Actions</u>"); <u>provided</u>, <u>however</u>, upon entry of the Final DIP Order, liens in favor of the DIP Agent and DIP Lenders shall attach to and be perfected in any proceeds of Avoidance Actions;

c.      pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Debtors' estates in the Chapter 11 Cases, that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, (other than property that is subject to the existing liens that secure obligations under the agreements referred to in clause (d) hereof, which liens shall be primed by the liens to be granted to the DIP Agent, for the benefit of itself and the DIP Lenders, as described in such clause);  and

d.      pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all of the property (such property, together with the property described in clauses (c) and (d) above, the

</div>

"Collateral") of the Debtors' estates in the Chapter 11 Cases (including, without limitation, inventory, accounts receivable, general intangibles, chattel paper, owned real estate, real property leaseholds, fixtures and machinery and equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements, and other intellectual property and capital stock of subsidiaries) that is subject to the existing liens that secure the obligations of any other lenders under or in connection with any existing credit agreement and related documents and agreements and all of which existing liens (the "Primed Liens") shall be primed by and made subject and subordinate to the perfected first priority senior liens to be granted to the DIP Agent, for the benefit of itself and the DIP Lenders, which senior priming liens in favor of the DIP Agent shall also prime any liens granted after the commencement of the Chapter 11 Cases to provide adequate protection in respect of any of the Primed Liens, subject, in each case, only to the Carve Out (clauses (b), (c) and (d) collectively, the "DIP Liens").

For purposes hereof, the term "Carve Out" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, (ii) all unpaid professional fees and disbursements incurred by the Debtors and any statutory committees appointed in the Chapter 11 Cases prior to the occurrence of an Event of Default and notice thereof delivered to the Debtors but only to the extent allowed by the Bankruptcy Court at any time and only to the extent of amounts included in the Approved Budget; provided, however, that notwithstanding the foregoing, with respect to SSG Advisors, LLC ("SSG"), the Carve Out shall include such transaction fees as may be agreed to by the Debtors, SSG, the DIP Agent, and the DIP Lenders.  On a weekly basis, the budgeted fees for professionals shall be placed in escrow and released to each professional upon approval of the Bankruptcy Court, and (iii) at any time after the occurrence of an Event of Default and notice thereof delivered to the Borrower, to the extent allowed at any time, whether before or after delivery of such notice, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid professional fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors and the committee and allowed by the Bankruptcy Court, not in excess of $100,000 for the

|  | Debtors' professionals and the committee's professionals (the "Carve Out Cap"); provided, further, that the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent or the DIP Lenders or the DIP Agent or the DIP Lenders' professionals and nothing herein shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates. |
|  | For purposes hereof, the term "Chapter 11 Cases" shall have the meaning set forth in the Interim DIP Order. |
|  | (2)  All of the liens described above shall be effective and perfected as of the date the Bankruptcy Court enters an Interim DIP Order or the Final DIP Order, as the case may be, and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, in each case subject to the terms and conditions set forth in the Interim DIP Order or the DIP Order, as the case may be. |
| **Adequate Protection** | (1) Prepetition Secured Parties shall be granted adequate protection in the form of (i) replacement liens (junior only to the DIP Liens and the Carve-Out), including proceeds of all amounts owed to the company by CMS and liens on the proceeds of Avoidance Actions, but with respect to liens on the proceeds of Avoidance Actions only upon entry of a Final DIP Order, to the extent of any post-petition diminution in the value of the prepetition collateral securing the claims of the Prepetition Secured Parties (including the amount by which the Prepetition Secured Parties are subordinated to amounts outstanding under the DIP Facility) ("Senior Replacement Liens") and (ii) monthly reimbursement of professional fees and expenses, including fees and expenses of counsel. |
|  | (2) The lenders under that certain Amended and Restated Second Lien Promissory Note, dated as of November 21, 2018, by and among the Borrower, Holdings, the other subsidiaries of Holdings from time to time party thereto, the lenders party thereto and Riverside Strategic Capital Fund I, L.P., as agent, (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition Second Lien Promissory Note") shall be granted adequate protection in the form of  replacement liens (junior only to the DIP Liens, the Senior Replacement Liens and the Carve-Out) on the same collateral supporting the Senior Replacement Liens to the extent of any post-petition diminution in the value of the collateral |

| | securing the claims of the Prepetition Secured Parties. |
|---|---|
| **Event of Default/Termination Events**: | The DIP Facility shall be subject to the following events of default:<br><br>1. Any payment default by the Debtors under the DIP Facility.<br><br>2. Any breach of, or failure to achieve or adhere to a covenant, representation, warranty or milestone under the DIP Facility.<br><br>3. Any misrepresentation or omission by a Debtor in or with respect to the DIP Facility in any respect; provided that with respect to any representation by the Debtor relating to compliance with health care laws or regulations, the Debtors' representation shall be solely that the Debtors have not knowingly committed any violation of such laws or regulations.<br><br>4. Any Debtor's failure to comply with any requirement of the Interim DIP Order or Final DIP Order; provided that with respect to any representation by the Debtor relating to compliance with health care laws or regulations, the Debtors' representation shall be solely that the Debtors have not knowingly committed any violation of such laws or regulations.<br><br>5. Any variance of ten percent (10%) or more with respect to projected receipts and disbursements on a line item basis as reflected in the Approved Budget, measured on a rolling two week basis; provided, however, that the 10% variance shall not apply to the payment of the DIP Agent's expenses, including professional fees and costs.<br><br>6. A failure by the Debtors, (a) within twenty-two (22) days after the petition date to have obtained an order of the Bankruptcy Court, or a stipulation among the Debtors and CMS, each in form and substance acceptable to the DIP Agent and DIP Lenders, directing CMS to pay or resume (as applicable) post-petition reimbursements arising under the Debtors' pre-petition Medicare participation agreement(s) without deduction, offset or withholding of any amount, and, thereafter (b) to maintain continuous and full participation in Medicare and to receive regular reimbursements from CMS under its Medicare participation agreement(s) without deduction, offset or withholding of any amount.<br><br>7. A failure by the Debtors, (a) within thirty (30) days after the |

petition date to have executed a written settlement or other agreement resolving all civil and criminal claims alleged by the United States Department of Justice and CMS (the "DOJ Settlement"), such settlement and resolution shall (i) be upon terms and conditions acceptable to the DIP Agent and DIP Lenders; and (ii) be subject only to Bankruptcy Court approval.

8. Subject to entry of the Final DIP Order, in the event that DIP Lenders and DIP Agent decide to file a Chapter 11 plan as contemplated hereby, a failure by the Debtors to actively cooperate and support the DIP Agent and DIP Lenders in the formulation, drafting, filing, prosecution and consummation of the plan (and documents related thereto).

9. If at any time either the Debtors' investment banker or the DIP Agent and DIP Lenders reasonably conclude that no qualified parties are interested in purchasing all or substantially all of the Debtors' assets in one or more transactions on terms satisfactory to the DIP Agent and DIP Lenders prior to the Maturity Date.

10. The granting, creation or approval of any lien on Collateral *pari passu* or senior to the DIP Liens granted to the DIP Agent.

11. Dismissal of any of the bankruptcy cases or any successor case with respect to any Debtor or conversion of any Debtor bankruptcy case to a Chapter 7 case or the sale of substantially all of the assets of any Debtor without the advance written consent of the DIP Agent.

12. Any material adverse change in the business of the Debtors.

13. Failure of the Debtors to obtain extension of the time to the largest extent permitted by the Bankruptcy Code to assume or reject executory contracts and unexpired leases.

14. Termination or expiration of any Debtor's exclusive right to file a plan in the bankruptcy case.

15. Appointment of a chapter 11 trustee or examiner with expanded powers or other person with expanded powers in any of the bankruptcy cases.

16. Granting of relief from the automatic stay to permit foreclosure on assets of any Debtor with a value in excess of $100,000.

17. Reversal, vacation or stay of the effectiveness of the Final DIP Order.

18. Failure of any of the DIP Liens or DIP Superpriority Claims to

| | |
|---|---|
| | be valid, perfected and enforceable in all respects. |
| | 19. Any failure of the board to adhere to the Approval Protocol. |
| | Upon the occurrence of an Event of Default (or Maturity Date), the obligations shall accelerate and become immediately due and payable and enforceable by the DIP Agent without further Bankruptcy Court approval. |
| **Certain Documentation Matters:** | Except as otherwise set forth herein, all terms and conditions in the Prepetition First Lien Credit Agreement shall apply and be binding upon the DIP Facility (provided, for the avoidance of doubt, that the Debtors shall not be required to make any representation as to solvency and provided further that with respect to any representation by the Debtor relating to compliance with health care laws or regulations, the Debtors' representation shall be solely that the Debtors have not knowingly committed any violation of such laws or regulations). |
| **Expenses and Indemnification:** | (1) The Debtors shall pay (a) all out-of-pocket expenses of the DIP Agent associated with the arrangement of the DIP Facility and the preparation, execution, delivery and administration of the Definitive Documentation and any amendment or waiver with respect thereto (including the fees, disbursements and other charges of counsels and financial advisors), (b) all out-of-pocket expenses of the DIP Agent and the DIP Lenders (including the reasonable fees, disbursements and other charges of counsels and financial advisors) in connection with the enforcement of the Definitive Documentation and (c) all other out-of-pocket expenses of the Prepetition Secured Parties (including, without limitation, the on-going monitoring of the Chapter 11 Cases, including attendance at hearings or other proceedings and the on-going review of documents filed with the Bankruptcy Court and the preparation of any and all pleadings). |
| | (2) The DIP Agent and the DIP Lenders (and their affiliates and their respective officers, directors, employees, partners, members, counsel, professionals, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of the indemnified party. |
| **Assignments and Participations:** | Each DIP Lender shall be permitted to assign all or a portion of its DIP Loan (other than to a Debtor or any of their Affiliates (to be defined in the Definitive Documentation)) with the consent, not to |

14

| | |
|---|---|
| | be unreasonably withheld, of the DIP Agent, unless the DIP Loan is being assigned to an affiliate of a DIP Lender or an approved fund. |
| **Counsel to the DIP Lenders and DIP Agent:** | Proskauer Rose LLP. |
| **Closing Date:** | Closing and funding of the DIP Facility to occur as promptly as is practicable after the entry of the Interim DIP Order (the "<u>Closing Date</u>"). |
| **Governing Law and Forum:** | The Definitive Documentation will provide that the Debtors will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state, county and city of New York and shall waive any right to trial by jury. New York law and, where applicable, the Bankruptcy Code, shall govern the Definitive Documentation. |
| **DIP Order Governs** | To the extent of any inconsistency between this Debtor-in-Possession Financing Term Sheet and the DIP Orders, the terms of the DIP Orders shall govern. |

**Annex A**
**Negative Covenants**

No Debtor shall, unless at any time the Required DIP Lenders expressly consent in writing, do the following (capitalized terms used herein without definition having the meaning set forth in the Debtor-in-Possession Financing Term Sheet to which this Annex is attached, or if not defined therein, the meaning set forth in the Prepetition First Lien Credit Agreement):

1.1    Debt. Not, and not permit any of the Debtors and their Subsidiaries to, create, incur, assume, or suffer to exist any Debt, except the following:

(a)    Obligations under the DIP Facility;

(b)    Debt incurred in the ordinary course of the Debtor's post-petition business as contemplated by the Approved Budget;

(c)    Debt consisting of unpaid insurance premiums owing to insurance companies and insurance brokers incurred in connection with the financing of insurance premiums in the ordinary course of business;

(d)    the Prepetition First Lien Loans; and

(e)    the Prepetition Second Lien Loans;

(f)    other Debt existing immediately prior to the petition date.

1.2    Liens. Not, and not permit any of the Debtors and their Subsidiaries to, create or permit to exist any Lien on any of its real or personal properties, assets, or rights of whatsoever nature (whether now owned or hereafter acquired), except the following:

(a)    Liens for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings and, in each case, for which it maintains adequate reserves in accordance with GAAP and the execution or other enforcement of which is effectively stayed;

(b)    Liens arising in the ordinary course of business (such as (i) Liens of carriers, warehousemen, mechanics and materialmen and other similar Liens imposed by law and (ii) Liens in the form of deposits or pledges incurred in connection with worker's compensation, unemployment compensation and other types of social security (excluding Liens arising under ERISA) or in connection with surety bonds, bids, performance bonds, and similar obligations) for sums not overdue or being diligently contested in good faith by appropriate proceedings and not involving any advances or borrowed money or the deferred purchase price of property or services and, in each case, for which it maintains adequate reserves in accordance with GAAP and the execution or other enforcement of which is effectively stayed;

16

(c)     Liens arising under the DIP Facility;

(d)     Liens arising under the Prepetition First Lien Documents;

(e)     Liens arising under the Prepetition Second Lien Documents; and

(f)     other Liens existing immediately prior to the petition date on the assets subject at such time to those Liens.

1.3     <u>Restricted Payments</u>. Not, and not permit any of the Debtors and their Subsidiaries to, (a) make any dividend or distribution to any holders of its Equity Interests; (b) purchase or redeem any of its Equity Interests; (c) pay any management fees, management expenses or indemnities, transaction-based fees, or similar fees to any of its equity holders or any Affiliate thereof; and (d) make any payment on account of Debt that is not reflected in the Approved Budget.

1.4     <u>Modification of Certain Documents</u> .

(a)     Not permit the organizational documents or governing documents of any Debtor to be amended or modified in any way that would reasonably be expected to materially adversely affect the interests of the DIP Agent or the DIP Lenders.

(b)     Not change, or allow any Debtor to change, its state of formation or its organizational form, except upon 30 days' prior notice to DIP Agent (or such shorter notice period as is satisfactory to the DIP Agent); provided that such Debtor shall take all actions requested by the DIP Agent or the DIP Lenders in their sole discretion to maintain a first-priority perfected Lien in favor of DIP Agent (subject to Permitted Liens) on substantially all of the assets of such Debtor prior to any such change.

(c)     Not permit any amendment, modification or change to the Prepetition First Lien Documents or the Prepetition Second Lien Documents.

(d)     Not amend, modify or waive (or make any payment consistent with an amendment, modification or waiver of), or apply to the Bankruptcy Court for authority to make any amendment, modification or waiver of, any provision of the Interim DIP Order or the Final DIP Order without in each case the prior written consent of the DIP Agent and the DIP Lenders (in each case, such consent not to be unreasonably withheld, conditioned or delayed).

1.5     <u>Transactions with Affiliates</u>. Not, and not permit any of the Debtors and their Subsidiaries to, enter into, or cause, suffer, or permit to exist any transaction, arrangement, or contract with any of its other Affiliates (other than the Debtors), except in the ordinary course of the Debtor's post-petition business.

1.6     <u>Compliance with Laws</u>. Borrower shall not, and shall not permit any of the Debtors and their Subsidiaries to, knowingly fail to comply with applicable laws, regulations and executive orders.

1.7     <u>Activities of Holdings and Parent</u>.

1.7.1     Except as may be permitted under the United States Bankruptcy Code, or by order of the Bankruptcy Court, Holdings shall not, directly or indirectly, engage in any business activities, hold any material assets, grant any Lien, or incur any Debt, other than (a) acting as a holding company and transactions incidental thereto; (b) entering into the DIP Facility, the Prepetition First Lien Documents and the Prepetition Second Lien Documents and the transactions required in the DIP Facility or permitted in the DIP Facility to be performed by Holdings; (c) entering into engagement letters and similar agreements with attorneys, accountants, and other professionals; (d) issuing Equity Interests and performing its obligations under its organizational documents, its governing documents, and agreements with the holders of its Equity Interests; and (e) in each case, engaging in activities incidental thereto.

1.7.2     Except as may be permitted under the United States Bankruptcy Code, or by order of the Bankruptcy Court, Parent shall not, directly or indirectly, engage in any business activities, hold any material assets, grant any Lien, or incur any Debt, other than (a) acting as a holding company and transactions incidental thereto; (b) entering into the DIP Facility, the Prepetition First Lien Documents and the Prepetition Second Lien Documents and the transactions required in the DIP Facility or permitted in the DIP Facility to be performed by Holdings; (c) entering into engagement letters and similar agreements with attorneys, accountants, and other professionals; (d) issuing Equity Interests and performing its obligations under its organizational documents, its governing documents, and agreements with the holders of its Equity Interests; and (e) in each case, engaging in activities incidental thereto.

1.8     When used in this Annex A the following terms have the following meanings:

"<u>Obligations</u>" means all obligations (monetary (including post-petition interest, allowed or not) or otherwise) of any Debtor under the DIP Facility all in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"<u>Prepetition First Lien Administrative Agent</u>" means the DIP Agent, in its capacity as administrative agent under the Prepetition First Lien Credit Agreement, and its permitted sub-agents, delegates, attorneys-in-fact, successors and assigns in such capacity, including Monroe Capital LLC.

"<u>Prepetition First Lien Documents</u>" means the Prepetition First Lien Credit Agreement and the other "Loan Documents" (as defined in the Prepetition First Lien Credit Agreement).

"<u>Prepetition First Lien Loans</u>" means the Debt outstanding under the Prepetition First Lien Credit Agreement on the Closing Date.

"<u>Prepetition First Lien Obligations</u>" shall have the meaning assigned to the term "Secured Obligations" in the GCA (as defined in the Prepetition First Lien Credit Agreement).

"Prepetition Second Lien Administrative Agent" means Riverside Strategic Capital Fund I, L.P., in its capacity as administrative agent under the Prepetition Second Lien Promissory Note, and its permitted successors and assigns in such capacity.

"Prepetition Second Lien Documents" means the Prepetition Second Lien Promissory Note and the other "Note Documents" (as defined in the Prepetition Second Lien Promissory Note).

"Prepetition Second Lien Loans" means the Indebtedness outstanding under the Prepetition Second Lien Promissory Note on the Closing Date.

"Prepetition Second Lien Obligations" shall have the meaning assigned to the term "Secured Obligations" in the GCA (as defined in the Prepetition Second Lien Promissory Note).

**Annex B**
**Guaranty**

Capitalized terms used herein without definition having the meaning set forth in the Debtor-in-Possession Financing Term Sheet to which this Annex is attached, or if not defined therein, the meaning set forth in the Prepetition First Lien Credit Agreement.

2.1     Guaranty.

(a)     Each of Parent, Holdings, and the Subsidiary Guarantors (each a "<u>Guarantor</u>" and collectively, the "<u>Guarantors</u>") hereby, jointly and severally, unconditionally and irrevocably, as a primary obligor and not only a surety, guarantees to DIP Agent, for itself and the ratable benefit of the DIP Lenders, the prompt and complete payment and performance by the Borrower when due (whether at the stated maturity, by acceleration or otherwise) of all obligations (monetary (including post-petition interest, allowed or not) or otherwise) of the Borrower under the DIP Facility all in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. The guarantee contained in this <u>Section **Error! Reference source not found.**</u> is a primary and original obligation of each Guarantor, is not merely the creation of a surety relationship, and is an absolute, unconditional, and continuing guaranty of payment and performance which will remain in full force and effect without respect to future changes in conditions.

(b)     Notwithstanding any provision of the DIP Facility to the contrary, the maximum liability of each Guarantor under the DIP Facility will in no event exceed the amount that can be guaranteed by that Guarantor under applicable federal and state laws relating to the insolvency of debtors (after giving effect to the right of contribution established in <u>Section 2.2</u>).

(c)     Each Guarantor agrees that the Secured Obligations may at any time and from time to time exceed the amount of the liability of that Guarantor under the DIP Facility without impairing the guaranty contained in this <u>Section **Error! Reference source not found.**</u> or affecting the rights and remedies of DIP Agent or any DIP Lender under the DIP Facility.

(d)     The guaranty contained in this <u>Section **Error! Reference source not found.**</u> will remain in full force and effect until Payment in Full of the Secured Obligations.

(e)     No payment made by Borrower, any of the Guarantors, any other guarantor, or any other Person or received or collected by DIP Agent or any DIP Lender from Borrower, any of the Guarantors, any other guarantor, or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Secured Obligations will be deemed to modify, reduce, release, or otherwise affect the liability of any Guarantor under the DIP Facility, which Guarantor will, notwithstanding any such payment (other than any payment made by that Guarantor in respect of the Secured Obligations or any payment received or collected from that Guarantor in respect of the Secured Obligations), remain liable for the Secured Obligations up to the maximum liability of that Guarantor under the DIP Facility until Payment in Full of the Secured Obligations.

2.2     <u>Right of Contribution</u>. Each Guarantor hereby agrees that to the extent that a Guarantor has paid more than its proportionate share of any payment made under this

Agreement, that Guarantor will be entitled to seek and receive contribution from and against any other Guarantor under the DIP Facility that has not paid its proportionate share of that payment. Each Guarantor's right of contribution will be subject to the terms and conditions of <u>Section 2.3</u>. The provisions of this <u>Section 2.2</u> in no respect limit the obligations and liabilities of any Guarantor to DIP Agent and the DIP Lenders, and each Guarantor will remain liable to DIP Agent and the DIP Lenders for the full amount guaranteed by that Guarantor under the DIP Facility.

      2.3   <u>No Subrogation</u>. Notwithstanding any payment made by any Guarantor under this Agreement or any set-off or application of funds of any Guarantor by DIP Agent or any DIP Lender, no Guarantor is or will be entitled to be subrogated to any of the rights of DIP Agent or any DIP Lender against Borrower or any other Guarantor or any collateral security or guaranty or right of offset held by DIP Agent or any DIP Lender for the payment of the Secured Obligations, and no Guarantor may seek or is or will be entitled to seek any contribution or reimbursement from Borrower or any other Guarantor in respect of payments made by that Guarantor under the DIP Facility until Payment in Full of the Secured Obligations. If any amount is paid to any Guarantor on account of those subrogation rights at any time before Payment in Full of the Secured Obligations, then that Guarantor shall hold that amount in trust for DIP Agent and the DIP Lenders, segregated from other funds of that Guarantor, and shall, promptly upon receipt by that Guarantor, turn that amount over to DIP Agent in the exact form received by that Guarantor (duly endorsed by that Guarantor to DIP Agent, if required), to be applied against the Secured Obligations, whether matured or unmatured, in such order as DIP Agent determines, unless otherwise specified in the DIP Facility.

      2.4   <u>Amendments, etc</u>.

      (a)   Each Guarantor will remain obligated under the DIP Facility notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, (i) any demand for payment of any of the Secured Obligations made by DIP Agent or the DIP Lenders may be rescinded by DIP Agent or any of the Secured Obligations may be continued; (ii) the Secured Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guaranty therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered, or released by DIP Agent (or the DIP Lenders, as the case may be); and (iii) the DIP Facility and any other documents executed and delivered in connection therewith may be amended, modified, supplemented, or terminated, in whole or in part, as DIP Agent (or the DIP Lenders, as the case may be) may deem advisable from time to time in accordance with the DIP Facility. Neither DIP Agent nor any DIP Lender has or will have any obligation to protect, secure, perfect, or insure any Lien at any time held by it as security for the Secured Obligations or for the guaranty contained in this <u>Section **Error! Reference source not found.**</u> or any property subject thereto.

      (b)   DIP Agent or the DIP Lenders may, from time to time, at their sole discretion and without notice to any Guarantor, take any or all of the following actions: (i) retain or obtain a security interest in any property to secure any of the Secured Obligations or any obligation under the DIP Facility; (ii) retain or obtain the primary or secondary obligation of any obligor or obligors, in addition to the undersigned, with respect to any of the Secured

Obligations; (iii) extend or renew any of the Secured Obligations for one or more periods (whether or not longer than the original period), alter or exchange any of the Secured Obligations, or release or compromise any obligation of any of Guarantor under the DIP Facility or any obligation of any nature of any other obligor with respect to any of the Secured Obligations; (iv) release any guaranty or right of offset or its security interest in, or surrender, release, or permit any substitution or exchange for, all or any part of any property securing any of the Secured Obligations or any obligation under the DIP Facility, or extend or renew for one or more periods (whether or not longer than the original period) or release, compromise, alter, or exchange any obligations of any nature of any obligor with respect to any such property; and (v) resort to any Guarantor (or any of them) for payment of any of the Secured Obligations when due, whether or not DIP Agent or the DIP Lenders have resorted to any property securing any of the Secured Obligations or any obligation under this Agreement or have proceeded against any other Guarantor or any other obligor primarily or secondarily obligated with respect to any of the Secured Obligations.

2.5     WAIVERS.

(a)     Each Guarantor waives, until the Secured Obligations are Paid in Full, to the furthest extent permitted by applicable law, any and all notice of the creation, renewal, extension, or accrual of any of the Secured Obligations and notice of or proof of reliance by DIP Agent or any DIP Lender upon the guaranty contained in this Section **Error! Reference source not found.** or acceptance of the guaranty contained in this Section **Error! Reference source not found.**. The Secured Obligations, and any of them, will conclusively be deemed to have been created, contracted, or incurred, or renewed, extended, amended, or waived, in reliance upon the guaranty contained in this Section **Error! Reference source not found.**, and all dealings between Borrower and any of the Guarantors, on the one hand, and DIP Agent and the DIP Lenders, on the other hand, likewise will be conclusively presumed to have been had or consummated in reliance upon the guaranty contained in this Section **Error! Reference source not found.**. To the furthest extent permitted by applicable law, each Guarantor waives, until the Secured Obligations are Paid in Full, to the furthest extent permitted by applicable law, (i) diligence, presentment, protest, demand for payment, and notice of default, dishonor, or nonpayment and all other notices whatsoever to or upon Borrower or any of the Guarantors with respect to the Secured Obligations; (ii) notice of the existence or creation or non-payment of all or any of the Secured Obligations; and (iii) all diligence in collection or protection of or realization upon any Secured Obligations or any security for or guaranty of any Secured Obligations. Without limiting the generality of any other waiver or other provision set forth in the guaranty contained in this Section **Error! Reference source not found.**, each Guarantor waives all rights and defenses that such Guarantor may have if all or part of the Secured Obligations are secured by real property to the furthest extent permitted by applicable law.

(b)     The waivers set forth in this Section 2.5 mean, among other things:

(i)     that DIP Agent or any DIP Lender may collect from any Guarantor without first foreclosing on any real or personal property collateral that may be pledged by that Guarantor, Borrower, or any other guarantor;

(ii)      that if DIP Agent or any DIP Lender forecloses on any real property collateral that may be pledged by any Guarantor, Borrower, or any other guarantor:

(A)      the amount of the Secured Obligations or any obligations of any guarantor in respect thereof may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and

(B)      DIP Agent may collect from that Guarantor even if DIP Agent or any DIP Lender, by foreclosing on the real property collateral, has destroyed any right such Guarantor may have to collect from Borrower, any other Guarantor or any other guarantor.

(c)      Each waiver set forth in this Section 2.5 is an unconditional and irrevocable waiver of any rights and defenses each Guarantor may have if all or part of the Secured Obligations are secured by real property to the furthest extent permitted under applicable law.

(d)      **Without limiting the generality of any other waiver or other provision set forth in the guaranty set forth in this Section** Error! Reference source not found.**, to the maximum extent permitted by applicable law, each Guarantor waives all rights and defenses arising out of an election of remedies by DIP Agent or any DIP Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for the Secured Obligations, has destroyed that Guarantor's rights of subrogation and reimbursement against Borrower by the operation of applicable law**.

2.6      Payments. Each Guarantor hereby guarantees that payments under the DIP Facility will be paid to DIP Agent without set-off or counterclaim in United States dollars at the office of DIP Agent specified in the definitive documentation for the DIP Facility.

2.7      Definitions. When used in this Annex B the following terms shall have the following meanings:

"Secured Obligations" means, collectively, all obligations (monetary (including post-petition interest, allowed or not) or otherwise) of the Guarantors under the DIP Facility all in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"Payment in Full" means (a) the payment in full in cash of all DIP Loans and other Secured Obligations, other than contingent indemnification obligations for which no claims have been asserted; (b) the termination of all commitments to fund DIP Loans; and (c) the release of any claims of the Debtors against DIP Agent and DIP Lenders arising on or before the payment date.

**Annex C**
**DIP Loan Commitments**

| DIP Lender | DIP Loan Commitment |
| --- | --- |
| Monroe Capital Private Credit Fund II LP | $ 2,052,305.79 |
| Monroe Capital Private Credit Fund II (Unleveraged) LP | $ 278,900.19 |
| Monroe Capital Private Credit Fund II-O (Unleveraged Offshore) LP | $ 320,092.45 |
| Monroe Private Credit Fund A LP | $ 1,893,784.59 |
| Monroe Capital Private Credit Fund I LP | $ 1,136,270.75 |
| Monroe FCM Direct Loan Fund LP | $ 227,254.15 |
| Monroe Capital MML CLO 2016-1, Ltd. | $ 368,992.08 |
| Silver Point Specialty Credit Fund L.P. | $ 1,098,580.00 |
| Silver Point Select Opportunities Fund A, L.P. | $ 470,820.00 |

**<u>EXHIBIT B</u>**

**BUDGET**

Draft - Subject to Material Change

**True Health Group, LLC**
**Weekly DIP Forecast**          7/30/2019
**USD ($000s)**                  Filing

| Month | Aug-19 | Aug-19 | Aug-19 | Aug-19 | Aug-19 | Sep-19 | Sep-19 | Sep-19 | Sep-19 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** | 8/2 | 8/9 | 8/16 | 8/23 | 8/30 | 9/6 | 9/13 | 9/20 | 9/27 | |
| **Fiscal Week #** | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | |
| **Forecast Week #** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | **Total** |
| **Forecast/Actual** | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |

**Collections**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] | Total Retail / Patient | $ 1,336 | $ 1,329 | $ 1,329 | $ 1,329 | $ 1,329 | $ 1,224 | $ 1,285 | $ 1,285 | $ 1,285 | $ 11,731 |
| [2] | Medicare Escrow Release / (Holdback) | (441) | (439) | (439) | (439) | (439) | (404) | (424) | (424) | (424) | (3,871) |
| [3] | **Total Collections** | **895** | **890** | **890** | **890** | **890** | **820** | **861** | **861** | **861** | **7,860** |

**Disbursements**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [4] | **Operating Disbursements** | | | | | | | | | | |
| [5] | Lab Supplies | $ 419 | $ 403 | $ 403 | $ 446 | $ 421 | $ 400 | $ 400 | $ 443 | $ 417 | $ 3,752 |
| [6] | Salary, Wage & Benefits | 180 | 158 | 722 | 158 | 848 | 181 | 740 | 181 | 740 | 3,908 |
| [7] | Commissions | - | - | - | - | 174 | - | - | - | 297 | 471 |
| [8] | Draw Log Expenses | - | 195 | - | - | 94 | - | 226 | - | 184 | 605 |
| [9] | Shipping | 193 | 93 | 93 | 93 | 94 | 89 | 89 | 89 | 89 | 923 |
| [10] | Occupancy & Insurance Expenses | 384 | 113 | - | - | - | 375 | 77 | - | - | 949 |
| [11] | Professional & Legal Fees | 61 | 61 | 61 | 61 | 61 | 72 | 72 | 72 | 72 | 594 |
| [12] | IT Expense | 23 | 23 | 23 | 23 | 23 | 28 | 28 | 28 | 28 | 225 |
| [13] | All Other Operating Expense | 77 | 72 | 72 | 72 | 222 | 79 | 79 | 79 | 79 | 828 |
| [14] | **Total Operating Disbursements** | **1,337** | **1,118** | **1,375** | **853** | **1,842** | **1,223** | **1,710** | **891** | **1,905** | **12,254** |
| [15] | Capital Expenditures | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 122 |
| [16] | **Cash Flow from Operations** | **$ (456)** | **$ (241)** | **$ (498)** | **$ 24** | **$ (965)** | **$ (417)** | **$ (862)** | **$ (43)** | **$ (1,058)** | **$ (4,516)** |
| [17] | **Restructuring Disbursements - Post-petition** | | | | | | | | | | |
| [18] | Utility Deposits | $ 26 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 26 |
| [19] | 503(b)(9) Claims | - | - | - | - | - | - | - | - | - | - |
| [20] | KEIP/KERP | - | - | - | - | - | - | - | - | - | - |
| [21] | Critical Vendor/Admin. Priority Claims | - | - | 250 | 250 | - | - | - | - | - | 500 |
| [22] | Wind-Down Costs | - | - | - | - | - | - | - | - | - | - |
| [23] | US Trustee Fees | - | - | - | - | - | - | - | - | - | - |
| [24] | Company Professional Fees | 120 | 238 | 238 | 238 | 238 | 156 | 156 | 126 | 126 | 1,635 |
| [25] | DIP Lender Professional Fees | 70 | 88 | 88 | 88 | 88 | 88 | 88 | 70 | 70 | 735 |
| [26] | UCC Professional Fees | - | - | 44 | 44 | 44 | 44 | 44 | 35 | 35 | 289 |
| [27] | Other Professional Fees | 31 | 31 | 31 | 31 | - | - | - | - | - | 125 |
| [28] | **Total Restructuring Disbursements - Post-petit** | **248** | **356** | **650** | **650** | **369** | **288** | **288** | **231** | **231** | **3,310** |
| [29] | **Net Cash flow before Debt Service** | **$ (690)** | **$ (584)** | **$ (1,134)** | **$ (612)** | **$ (1,320)** | **$ (691)** | **$ (1,136)** | **$ (261)** | **$ (1,275)** | **$ (7,705)** |
| [30] | **Debt Service** | | | | | | | | | | |
| [31] | Interest Expense/Fees | $ - | $ - | $ - | $ - | $ 22 | $ - | $ - | $ - | $ - | $ 22 |
| [32] | Principal Payment | - | - | - | - | - | - | - | - | - | - |
| [33] | **Total Debt Service** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 22** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 22** |
| [34] | **Total Disbursements** | **1,599** | **1,488** | **2,038** | **1,516** | **2,246** | **1,524** | **2,011** | **1,136** | **2,150** | **15,708** |
| [35] | **Net Cash Flow** | **$ (704)** | **$ (598)** | **$ (1,148)** | **$ (626)** | **$ (1,356)** | **$ (704)** | **$ (1,150)** | **$ (275)** | **$ (1,289)** | **$ (7,848)** |
| [36] | **Cumulative Net Cash Flow** | **(704)** | **(1,301)** | **(2,449)** | **(3,075)** | **(4,431)** | **(5,135)** | **(6,285)** | **(6,559)** | **(7,848)** | |

**Cash & Availability**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [37] | **Beginning Cash Balance** | $ 1 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 1 |
| [38] | Net Cash Flow | (704) | (598) | (1,148) | (626) | (1,356) | (704) | (1,150) | (275) | (1,289) | (7,848) |
| [39] | Funding | 1,202 | 598 | 1,148 | 626 | 1,356 | 704 | 1,150 | 275 | 789 | 7,847 |
| [40] | **Ending Cash Balance** | **$ 500** | **$ 500** | **$ 500** | **$ 500** | **$ 500** | **$ 500** | **$ 500** | **$ 500** | **$ -** | **$ -** |

**<u>EXHIBIT C</u>**

**INTERIM ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| THG Holdings LLC, *et al.*, | Case No. 19-11689 (JTD) |
| Debtors.[1] | Joint Administration Requested |
| | **Re: D.I. ____** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362,
364(c)(1), 364(c)(3), 364(d)(1), AND 364(e) AND (B) USE CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION
PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (III) SCHEDULING
FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

Upon the motion, dated as of July 30, 2019 (the "Motion")[2] of True Health Diagnostics

LLC ("THD") and its affiliated debtors and debtors-in-possession (collectively with THD, the

"Debtors"), pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1),

and 364(e), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-2, and 9013-1(m) of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Bankruptcy Local Rules"), seeking entry of (i) an interim order (this

"Interim Order") and (ii) a final order (the "Final Order"); and the Debtors' having requested on

the record at the interim hearing on the Motion (the "Interim Hearing") that the Court enter an

Interim Order, *inter alia*,:

---

[1]    The Debtors in these cases, along with the last four digits of each Debtors' federal EIN, are as follows: THG Holdings LLC (8292); True Health Group LLC (9158); True Health Clinical LLC (5272); True Health Diagnostics LLC (9452); True Health IP LLC (5427); Outreach Management Solutions LLC d/b/a True Health Outreach (9424); Health Core Financial LLC d/b/a True Health Financial (6614). The Debtors' mailing address is 3803 Parkwood Blvd., Suite 400, Frisco, Texas 75034.

[2]    Unless otherwise defined, capitalized terms used herein shall have the meaning ascribed to them in the Term Sheet (as defined below).

(a)      authorizing the Debtors to obtain secured postpetition financing on a superpriority basis (the "DIP Facility") pursuant to the terms and conditions of that certain Debtor-in-Possession Financing Term Sheet, dated as of July 30, 2019 (the "Term Sheet"), attached to the Motion as Exhibit A, in the aggregate principal amount of up to $7,847,000;[3]

(b)      authorizing the Debtors to execute any other documents, agreements, and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Agent (as the same may be amended, restated, supplemented, or otherwise modified from time to time, and collectively with the Term Sheet, the "DIP Loan Documents");

(c)      granting to the DIP Agent, for itself and for the benefit of the DIP Lenders first priority security interests in and liens on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable, this Interim Order and the Final Order, as applicable (collectively, and including all "Obligations" as described in the Term Sheet, the "DIP Obligations"), subject only to prior payment of the Carve Out (as defined below);

(d)      granting allowed superpriority administrative expense claims to the DIP Agent and the DIP Lenders;

(e)      authorizing the Debtors to use Cash Collateral (as defined below);

(f)      authorizing the Debtors to grant adequate protection to the Prepetition Secured Parties and the Prepetition Second Lien Lenders (as defined below);

---

[3]   The "DIP Lenders" shall mean the Prepetition Secured Parties (as defined below) (from and after the consummation of the DIP Facility).  The Prepetition First Lien Administrative Agent (as defined below) shall serve as the "DIP Agent" for and on behalf of the DIP Lenders.

(g)     scheduling a hearing (the "Final Hearing"), pursuant to Bankruptcy Rule 4001(c)(2), to consider entry of the Final Order ((a) through (g) collectively, the "Requested Relief");

and the Interim Hearing having been held on July 31, 2019; and upon all of the pleadings filed with the Court and the evidence proffered or adduced at the Interim Hearing; and the Court having heard and resolved or overruled any and all objections to the Requested Relief; and it appearing that the Requested Relief is in the best interests of the Debtors, their estates, and creditors; and upon the record herein; and after due deliberation thereon, and good and sufficient cause appearing therefor:

### IT IS HEREBY FOUND AND DETERMINED THAT:[4]

A.     Petition Date.  On July 30, 2019 (the "Petition Date"), the Debtors commenced their chapter 11 cases (these "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of creditors holding unsecured claims (a "Creditors' Committee") has been appointed in any of these Chapter 11 Cases.

B.     Jurisdiction; Venue.  The Court has jurisdiction over these Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the DIP constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D). The Court is a proper venue of these Chapter 11 Cases and the Requested Relief under 28 U.S.C.

---

[4]     Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable, pursuant to Bankruptcy Rule 7052.

§§ 1408 and 1409. The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 and the applicable Bankruptcy Local Rules.

C.    <u>Notice</u>. Proper, timely, adequate, and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending a Final Hearing.

D.    <u>Prepetition Senior Obligations and Senior Liens</u>.

(i)    For purposes of this Interim Order, (a) the term "<u>Prepetition Senior Obligations</u>" shall mean all of the Obligations (as such term is defined in the Prepetition Senior Loan Documents (as defined below)), as of the Petition Date, owed to the Prepetition First Lien Administrative Agent for the Prepetition Secured Parties, and (b) the term "<u>Prepetition Senior Loan Documents</u>" shall mean that certain Credit Agreement, dated as of January 26, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "<u>Prepetition First Lien Credit Agreement</u>"), by and among True Health Diagnostics LLC, as borrower (the "<u>Borrower</u>"), True Health Group LLC ("<u>Holdings</u>"), the other subsidiaries of Holdings from time to time party thereto, the various financial institutions from time to time party thereto, as lenders, and Monroe Capital Management Advisors, LLC, as administrative agent (together with its permitted sub-agents, delegates, attorneys-in-fact, successors and assigns, including Monroe Capital LLC, the "<u>Prepetition First Lien Administrative</u>

Agent") (and together with such lenders, the "<u>Prepetition Secured Parties</u>") and together with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, instruments, amendments, fee letters and any other agreements delivered pursuant thereto or in connection therewith.

(ii)     To secure the Prepetition Senior Obligations, the Debtors granted to the Prepetition First Lien Administrative Agent, for the benefit of the Prepetition Secured Parties, first priority liens upon and senior security interest in (the "<u>Prepetition Senior Liens</u>") substantially all of the Debtors' property and assets (collectively, the "<u>Prepetition Senior Collateral</u>") as more particular set forth in certain security documents and instruments, including but not limited to the (a) Guaranty and Collateral Agreement, dated as of January 26, 2017, by and among True Health Diagnostics LLC, and each other person signatory such agreement as a grantor, in favor of the Prepetition First Lien Administrative Agent; (b) Trademark Security Agreement, dated as of January 26, 2017, by True Health IP LLC, in favor of the Prepetition First Lien Administrative Agent; (c) Patent Security Agreement, dated as of January 26, 2017, by True Health IP LLC, in favor of the Prepetition First Lien Administrative Agent; (d) Copyright Security Agreement, dated as of January 26, 2017, by True Health IP LLC, in favor of the Prepetition First Lien Administrative Agent; (e) Limited Guaranty and Pledged Agreement, dated as of May 18, 2018, by THG Holdings LLC in favor of the Prepetition First Lien Administrative Agent; and (f) each Control Agreement (as defined in the Prepetition First Lien Credit Agreement);

E.       <u>Prepetition Second Lien Obligations and Prepetition Second Liens</u>.

(i)       For purposes of this Interim Order, the term "<u>Prepetition Second Lien</u> <u>Obligations</u>" shall mean all of the Obligations (as such term is defined in the Prepetition Second Lien Promissory Note (as defined below)), as of the Petition Date, owing by the Debtors to Riverside Strategic Capital Funds I, L.P. as agent for certain lenders under that certain Amended and Restated Second Lien Promissory Note, dated as of November 21, 2018 (the "<u>Prepetition Second Lien Promissory Note</u>"), by and among the Borrower, Holdings, the other subsidiaries of Holdings from time to time party thereto, the lenders party thereto (the "<u>Prepetition Second Lien Lenders</u>"), and Riverside Strategic Capital Funds I, L.P. as agent (the "<u>Prepetition Second Lien Administrative Agent</u>").

(ii)       To secure the Prepetition Second Lien Obligations, the Debtors granted the Prepetition Second Lien Administrative Agent, for the benefit of itself and the Prepetition Second Lien Lenders, certain second priority liens (the "<u>Prepetition Second</u> <u>Liens</u>" and together with the Prepetition Senior Liens, the "<u>Prepetition Liens</u>") on certain collateral (the "<u>Prepetition Second Lien Collateral</u>" and together with the Prepetition Senior Collateral, the "<u>Prepetition Collateral</u>").

(iii)       Pursuant to the Intercreditor and Subordination Agreement, dated as of May 18, 2018, (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>Intercreditor Agreement</u>") by and among the Debtors, Holdings, each of the entities listed as a guarantor thereto, Riverside Strategic Capital Fund I, L.P., and the other Subordinated Creditors (as defined in the Intercreditor Agreement), and Monroe Capital Management Advisors, LLC, the Prepetition Second Lien Obligations and the

Prepetition Second Liens securing them are junior and subordinate to the Prepetition Senior Obligations and the Prepetition Senior Liens securing them.

F.      Debtors' Acknowledgements and Stipulations.

The Prepetition Senior Obligations

In requesting the DIP Facility, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility, the Debtors acknowledge, represent, stipulate, and agree, subject to the terms and provisions of Paragraph 15 below that:

(i)      upon approval of this Interim Order by the Court, the Debtors have obtained all authorizations, consents, and approvals required to be obtained from, and have made all filings with and given all notices required to be given to, all federal, state, and local governmental agencies, authorities and instrumentalities in connection with the execution, delivery, validity and enforceability of the DIP Loan Documents and the use of Cash Collateral to which any Debtor is a party;

(ii)     until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens and security interests provided to the DIP Agent and the DIP Lenders by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim pursuant to section 364(d) of the Bankruptcy Code, or otherwise, except with respect to prior payment of the Carve Out;

(iii)    until such time as all DIP Obligations are indefeasibly paid in full in cash, without the written consent of the DIP Agent the Debtors shall not in any way or at any time permit to exist an administrative expense claim against the Debtors of any kind of nature whatsoever, including, without limitation, claims for any administrative expenses

(a) on account of any break-up fee and expense reimbursement authorized to be paid to any person or entity, or (b) of the kind specified in, or arising or ordered under sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113, and 1114 of the Bankruptcy Code, that is superior to or *pari passu* with the DIP Superiority Claim (as defined below) provided herein, except with respect to prior payment of the Carve Out;

(iv)    the Debtors have requested that the Prepetition Secured Parties and the Prepetition Second Lien Lenders consent to, among other things, (a) the Debtors' use of Cash Collateral and the other Prepetition Collateral, (b) the incurrence of the DIP Obligations by the Borrower and the Guarantors' guarantees of the DIP Obligations under the DIP Loan Documents, and (c) the Debtors' granting of the priming DIP Liens in connection therewith.  The Prepetition First Lien Administrative Agent, the Prepetition Secured Parties, the Prepetition Second Lien Administrative Agent, and the Prepetition Second Lien Lenders are entitled, pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral (x) in exchange for their consent to allow the Debtors' use of such Prepetition Collateral, including the Cash Collateral, and (y) for any diminution resulting from the sale, lease, or use by the Debtors (or other decline in value) of Cash Collateral and any other Prepetition Collateral, the priming of the Prepetition Liens by the DIP Agent and DIP Lenders pursuant to this Interim Order, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or otherwise;

(v)    as of the Petition Date, (a) the aggregate principal amount of the Prepetition Senior Obligations of not less than $121,592,378.29, plus accrued and unpaid interest of not less than $1,067,881.75, together with premiums, costs, expenses, fees

(including attorneys' fees), indemnities, reimbursement obligations and other charges and Obligations owed by the Debtors are due and payable under the Prepetition First Lien Credit Agreement; (b) all of the Prepetition Senior Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors and are unconditionally owing by the Debtors to the Prepetition Secured Parties, and (c) the Prepetition Senior Obligations are not subject to any avoidance, reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity, except as set forth in Paragraph 15 below;

(vi)    The Prepetition Senior Liens constitute valid, binding, enforceable, non-avoidable and perfected liens on all or substantially all of the Debtors' assets with priority over any and all other liens (other than Permitted Liens, as defined in the Prepetition First Lien Loan Documents) and are not subject to any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity;

(vii)    any payments made on account of the Prepetition Senior Obligations prior to the Petition Date were (a) payments out of the Prepetition Collateral, and/or (b) made in the ordinary course of business, and did not diminish any property otherwise available for distribution to unsecured creditors;

(viii)    the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims

9

under chapter 5 of the Bankruptcy Code and applicable non-bankruptcy law, against the Prepetition First Lien Administrative Agent, and of the Prepetition Secured Parties, or any affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees of the Prepetition First Lien Administrative Agent, or any of the Prepetition Secured Parties arising out of, based upon or related to the Prepetition First Lien Loan Documents, or the Prepetition Senior Obligations;

(ix)        all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral constitutes Cash Collateral of the Prepetition Secured Parties;

(x)        none of the DIP Agent, DIP Lenders, Prepetition First Lien Administrative Agent, or the Prepetition Secured Parties is a control person or insider of the Debtors, nor owes any fiduciary obligation to the Debtors, by virtue of or with respect to any of the actions taken by them in respect of or in connection with the DIP Loan or the Prepetition Senior Obligations;

(xi)        the Prepetition First Lien Administrative Agent (on behalf of itself and the Prepetition Secured Parties) and the Prepetition Second Lien Administrative Agent (on behalf of itself and the Prepetition Second Lien Lenders) are parties to the Intercreditor Agreement, which sets forth subordination and other provisions governing the relative priorities and rights of the Prepetition Senior Obligations and the Prepetition Senior Liens, on the one hand, and the Prepetition Second Lien Obligations and the Prepetition Second Liens, on the other hand.  The Debtors admit, stipulate, and agree that the Intercreditor Agreement was entered into in good faith and is fair and reasonable to the parties thereto and enforceable in accordance with the terms thereof.

<u>The Prepetition Second Lien Obligations</u>

In exchange for the agreement by the Prepetition Second Lien Lenders to the priming of their liens and claims in connection with the DIP Facility, the Debtors acknowledge, represent, stipulate, and agree, subject to the terms and provisions of Paragraph 15 below that:

(i)      as of the Petition Date, (a) the aggregate principal amount of the Prepetition Second Lien Obligations of not less than approximately $60,300,000, together with interest (including default interest) thereon, premiums, costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges and Obligations owed by the Debtors are due and payable under the Prepetition Second Lien Promissory Note; (b) all of the Prepetition Second Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors and are unconditionally owing by the Debtors to the Prepetition Second Lien Lenders, and (c) the Prepetition Second Lien Obligations are not subject to any avoidance, reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity, except as set forth in Paragraph 15 below;

(ii)      The Prepetition Second Liens constitute valid, binding, enforceable, non-avoidable and perfected second priority liens on all or substantially all of the Debtors' assets with priority over any and all other liens (other than Permitted Liens, as defined in the Prepetition First Lien Loan Documents) and are not subject to any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims,

11

counterclaims, cross-claims, offsets, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity; and

(iii) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code and applicable non-bankruptcy law, against the Prepetition Second Lien Administrative Agent, and of the Prepetition Second Lien Lenders, or any affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees of the Prepetition Second Lien Administrative Agent, or any of the Prepetition Second Lien Lenders arising out of, based upon or related to the Prepetition Second Lien Promissory Note.

G.     Cash Collateral. For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the DIP Agent, the Prepetition Secured Parties, or the Prepetition Second Lien Lenders have a lien, security interest, or other interest (including, without limitation, any adequate protection liens or security interests) whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise and shall include, without limitation:

(i)     all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, including insurance policies (including, without limitation, policies for the benefit of directors and officers of the Debtors), in or on which the Prepetition Secured Parties or the Prepetition Second Lien Lenders have a lien or a replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of these Chapter 11 Cases, or arose or was generated thereafter;

(ii)       all of the respective deposits, refund claims, and rights in retainers of the Debtors on which the Prepetition Secured Parties or the Prepetition Second Lien Lenders have a lien or replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise; and

(iii)       the proceeds of any sale of DIP Collateral or Prepetition Collateral in connection with any sale consummated prior to entry of the Final Order.

H.       <u>Adequate Protection</u>.  The Prepetition Secured Parties and the Prepetition Second Lien Lenders are each entitled, pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, in exchange for the Debtors' use of such Prepetition Collateral, to the extent of the diminution in value, if any, of the Prepetition Collateral, including, without limitation, any diminution in value resulting from (i) the sale, lease, or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, (ii) the priming of the Prepetition Liens on and in the Prepetition Collateral by the DIP Agent or the DIP Lenders, (iii) the subordination of the Prepetition Senior Obligations and the Prepetition Second Lien Obligations to the Carve Out, or (iv) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

I.       <u>Purpose and Necessity of Financing</u>.  The Debtors require the financing described in the Requested Relief to (i) permit the continuation of their businesses and preserve their going concern value, (ii) satisfy payroll obligations and other working capital and general corporate purposes of the Debtors consistent with the terms set forth in the DIP Loan Documents and the Approved Budget (as defined below), and (iii) pay fees and expenses related to the DIP Loan Documents and the Chapter 11 Cases.  If the Debtors do not obtain authorization to borrow

under the Term Sheet (and, upon entry of a Final Order, the DIP Credit Agreement), they will suffer immediate and irreparable harm. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) or (d) of the Bankruptcy Code, on more favorable terms than those set forth in the DIP Loan Documents, based on the totality of the circumstances. A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without granting the DIP Agent, for the benefit of the DIP Lenders, superpriority claims, liens, and security interests, pursuant to section 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Loan Documents. After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time.

J.      <u>Willingness to Provide Financing</u>. The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to the entry of this Interim Order, and conditioned upon the entry of the Final Order, including findings that such financing is essential to the Debtors' estates, the DIP Lenders are extending credit to the Debtors as set forth in the DIP Facility in good faith, and that the claims, superpriority claims, security interests, liens, rights, and other protections granted to the DIP Lenders and DIP Agent will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order, the Final Order, or any other order.

K.      <u>Good Cause Shown</u>. Good cause has been shown for entry of this Interim Order. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents is vital to the Debtors' estates and creditors. The liquidity to be provided under the

DIP Loan Documents will enable the Debtors to continue to operate their businesses in the ordinary course, preserve the value of the Debtors' assets and pursue a restructuring transaction. Among other things, entry of this Interim Order is necessary to maximize the value of the Debtors' assets and to avoid immediate and irreparable harm to the Debtors and their estates, and, accordingly, is in the best interests of, the Debtors, their estates, and their creditors.

L.      <u>Sections 506(c) and 552(b) Waivers</u>.  In light of (i) the DIP Agent's and the DIP Lenders' agreement to permit their DIP Liens and DIP Superpriority Claim to be subject to prior payment of the Carve Out, and in exchange for and as a material inducement to the DIP Agent and DIP Lenders to agree to provide the DIP Facility and (ii) the agreement of the Prepetition First Lien Administrative Agent, the Prepetition Secured Parties, the Prepetition Second Lien Lenders, and the Prepetition Second Lien Administrative Agent to permit their Prepetition Liens to be subject to prior payment of the Carve Out, the DIP Liens, and the DIP Superpriority Claim and to permit the use of their Cash Collateral for payments made in accordance with the Approved Budget and the terms of this Interim Order, the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, and the Prepetition Secured Parties are each entitled to (a) subject to entry of the Final Order, a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (b) subject to entry of the Final Order in the case of the Prepetition First Lien Administrative Agent and Prepetition Secured Parties, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

M.      <u>Good Faith</u>.  The terms of the DIP Loan Documents, including, without limitation, the interest rates and fees applicable, and intangible factors relevant thereto, are more favorable to the Debtors than those available from alternative sources.  Based upon the record before the Court, the DIP Loan Documents have been negotiated in good faith and at arm's-

length among the Debtors, the DIP Lenders, and the DIP Agent under no duress, and without undue influence, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility, and the use of Cash Collateral, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing.  Any DIP Obligations and other financial accommodations made to the Debtors by the DIP Agent and the DIP Lenders pursuant to the DIP Loan Documents and this Interim Order shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders shall be entitled to all protections afforded thereby.

       N.    <u>Fair Consideration and Reasonably Equivalent Value</u>.  All of the Debtors have received and will receive fair and reasonable consideration in exchange for access to the DIP Facility and all other financial accommodations provided under the DIP Loan Documents and this Interim Order.  The terms of the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

       O.    <u>Immediate Entry of Interim Order</u>.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Bankruptcy Local Rule 4001-2(b).  The permission granted herein to enter into the DIP Loan Documents and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for access

to the financing necessary for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing businesses and further enhance the Debtors' prospects for a successful reorganization or sale of substantially all of their assets.

Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      <u>Disposition</u>.   The relief requested by the Debtors on the record at the Interim Hearing is granted on the terms set forth in this Interim Order.   Any objection to the interim relief sought by the Debtors that has not previously been withdrawn or resolved is hereby overruled on its merits.   The term of this Interim Order, the DIP Loan Documents, and the use of Cash Collateral authorized hereunder shall expire, and the DIP Facility made pursuant to this Interim Order and the DIP Loan Documents will mature, and together with all interest thereon and any other obligations accruing under the DIP Loan Documents, will become due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Interim Order by way of acceleration or otherwise) on the earlier of (a) twenty-two (22) days after the Petition Date if a Final DIP Order has not been entered prior to such date, or (b) termination of the DIP Facility by the DIP Agent following the occurrence of an Event of Default.

<u>**AUTHORIZATION FOR DIP FINANCING AND USE OF CASH COLLATERAL**</u>

2.      <u>Authorization For DIP Financing And Use of Cash Collateral</u>.

(i)      The Debtors are hereby authorized, on an interim basis, to incur DIP Obligations immediately subject to the terms of this Interim Order, the Approved Budget, and

17

the DIP Loan Documents, in the aggregate principal amount of up to $3,574,000. Available financing under the DIP Loan Documents shall, on an interim basis, be made to fund, strictly in accordance with the Approved Budget, working capital and general corporate requirements of the Debtors, bankruptcy-related costs and expenses (including interest, fees, and expenses in accordance with this Interim Order or the DIP Loan Documents), and any other amounts required or allowed to be paid in accordance with this Interim Order, but only as and to the extent authorized by the Approved Budget and the DIP Loan Documents.

(ii)     The Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in this Interim Order, the Approved Budget (and permitted variances as set forth in the DIP Loan Documents) and the DIP Loan Documents, without further approval by the Court.

(iii)     The Debtors have delivered to the DIP Agent and DIP Lenders a budget that sets forth projected cash receipts and cash disbursements (by line item) on a weekly basis for the time period from and including the Petition Date through September 28, 2019, a copy of which is attached hereto as Exhibit A (the "Approved Budget"). The Approved Budget shall at all times be in form and substance acceptable to the DIP Agent and the DIP Lenders, and approved in writing by the DIP Agent and the DIP Lenders in their sole and absolute discretion. The Debtors shall provide updates to the Approved Budget and financial reporting with respect to the Debtors in accordance with the terms of the DIP Loan Documents and shall provide copies of updates to the Approved Budget to the U.S. Trustee and counsel for any Creditors' Committee. Funds borrowed under the DIP Loan Documents and Cash Collateral used under this Interim Order shall be used by the Debtors in accordance with the DIP Loan Documents and this Interim Order. The consent of the DIP Agent, and DIP Lenders to any Approved Budget

shall not be construed as a commitment to provide the DIP Facility or, to the extent permitted by Paragraph 11 below, to permit the use of Cash Collateral after the occurrence of a Termination Event under this Interim Order, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(iv)    Any amendments, supplements, or modifications to the Approved Budget must be consented to in writing by the DIP Agent and the DIP Lenders in their sole discretion prior to the implementation thereof and shall not require further notice, hearing, or court order; provided, however that notice of any such amendment, supplement, or modification shall be provided to the U.S. Trustee and counsel to the Creditors' Committee.

(v)    The DIP Agent and the DIP Lenders (i) may assume the Debtors will comply with the Approved Budget, and (ii) shall have no duty to monitor such compliance. All advances and extensions of credit shall be based upon the terms and conditions of the DIP Loan Documents, as the same may be adjusted from time to time. Subject to the terms and conditions of this Interim Order, the DIP Agent and the DIP Lenders shall have the right but not the obligation to extend credit independent of any Approved Budget line item restrictions on loan availability set forth in the DIP Loan Documents, and all such DIP Obligations shall be entitled to the benefits and protections of this Interim Order.

(vi)    To the extent any court order is entered directing disgorgement of any payments made by the Debtors to the Prepetition First Lien Administrative Agent or the Prepetition Secured Parties either prior to or after the Petition Date, 100% of the proceeds recovered by the Debtors' estates in connection with such order(s) directing disgorgement shall be applied first to repayment of the DIP Obligations, until the DIP Obligations are indefeasibly

paid in full in cash, and then to repayment of claims in accordance with the priority scheme set forth in the Bankruptcy Code.

(vii)      The Prepetition Second Lien Lenders and the Prepetition Second Lien Administrative Agent have consented, and are deemed to have consented pursuant to Section 2.3(A) of the Intercreditor Agreement, to the terms and provisions of the DIP Facility and the DIP Loan Documents.  Nothing in this Interim Order shall limit, abridge, waive, diminish, impair, or otherwise affect the relative rights and obligations of the parties to the Intercreditor Agreement.

3.   <u>Authority to Execute and Deliver Necessary Documents</u>.

(i)      Each of the Debtors is authorized to negotiate, prepare, enter into, and deliver the DIP Loan Documents, in each case including any amendments thereto and borrow money under the DIP Facility, on an interim basis, in accordance with the terms of this Interim Order and the DIP Loan Documents.  Each of the Debtors is further authorized and directed to negotiate, prepare, enter into and deliver any UCC financing statements, pledge and security agreements, mortgages or deeds of trust, or similar documents or agreements encumbering all of the DIP Collateral and securing all of the Debtors' obligations under the DIP Loan Documents, each as may be reasonably requested by the DIP Agent, for itself or on behalf of the DIP Lenders, or the DIP Lenders.  The Prepetition Liens shall be deemed continuing liens to secure (i) the DIP Obligations, and (ii) the Prepetition Senior Obligations and the Prepetition Second Lien Obligations in accordance with the priorities set forth in this Interim Order. All Prepetition First Lien Loan Documents[5] and Prepetition Second Lien Documents[6] evidencing the grant,

---

[5]   The term "<u>Prepetition First Lien Loan Documents</u>" shall mean the Prepetition First Lien Credit Agreement and the other "Loan Documents" (as defined in the Prepetition First Lien Credit Agreement).

priority and perfection of the Prepetition Liens on Prepetition Collateral shall (x) remain in full force and effect and continue to secure the Prepetition Senior Obligations and the Prepetition Second Lien Obligations, (y) be deemed, upon entry of this Order, to secure, mutatis mutandis, the DIP Obligations for the benefit of the DIP Agent and the DIP Lenders, and (z) inure also to the benefit of, and shall be exercisable exclusively by, the DIP Agent, until all of the DIP Obligations have been indefeasibly paid in full, at which time exclusive control shall automatically revert to the Prepetition First Lien Administrative Agent.

(ii)        Each of the Debtors is further authorized to (i) perform all of its obligations under the DIP Loan Documents, and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for therein and in this Interim Order, and (ii) perform all acts required under the DIP Loan Documents and this Interim Order.

4.        Valid and Binding Obligations.  All obligations under the DIP Loan Documents shall constitute valid and binding obligations of each of the Debtors, enforceable against each of them, each of their estates, and each of their successors and assigns, jointly and severally, including, without limitation, any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case (as defined below), in accordance with their terms and the terms of this Interim Order, and no obligation, payment, transfer, or grant of a lien or security interest under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise),

---

6   The term "Prepetition Second Lien Documents" shall mean the Prepetition Second Lien Promissory Note and the other "Note Documents" (as defined in the Prepetition Second Lien Promissory Note).

counterclaims, cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.  The DIP Obligations include all loans and any other indebtedness or obligations, contingent or absolute, now existing or hereafter arising, which may from time to time be or become owing by the Debtors to the DIP Lenders and the DIP Agent under the DIP Loan Documents, including without limitation all principal, interest, costs, fees, expenses and other amounts owed pursuant to the DIP Loan Documents.

5.     <u>Termination of DIP Loan Documents</u>.  Notwithstanding anything in this Interim Order to the contrary, the term of this Interim Order and the DIP Loan Documents shall expire, and the DIP Facility made pursuant to this Interim Order and the DIP Loan Documents will mature, and together with all interest thereon and any other obligations accruing under the DIP Loan Documents, will become due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Interim Order by way of acceleration or otherwise) on the date that is the earliest of: (a) twenty-two (22) days after the Petition Date if a Final DIP Order has not been entered prior to such date, (b) September 28, 2019, (c) the date of consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code, (c) the occurrence of the effective date of any confirmed plan of reorganization in the Chapter 11 Cases, or (b) termination of the DIP Facility by the DIP Agent following the occurrence of an Event of Default.

6.     <u>Authorization for Payment of DIP Financing Fees and Expenses</u>.  All fees paid and payable, and all costs and/or expenses reimbursed or reimbursable (including, without limitation, all fees, costs and expenses referred to in the DIP Loan Documents) by the Debtors to the DIP Agent are hereby approved.  The Debtors are hereby authorized and directed to pay all such fees, costs, and expenses in accordance with the terms of the DIP Loan Documents and this

Interim Order, without any requirement that any party or their counsel file any further application or other pleading, notice, or document with the Court for approval or payment of such fees, costs, or expenses.  Notwithstanding anything to the contrary herein, the fees, costs, and expenses of the DIP Agent and DIP Lenders, whether incurred prior to or after the Petition Date, including, without limitation, all fees referred to in the DIP Loan Documents and all attorneys' fees and expenses, shall be deemed fully earned, non-refundable, and irrevocable as of the date of this Interim Order, except with respect to reimbursement of professional fees and expenses, which shall be subject to the fee review procedures set forth below in Paragraph 6(i) and (ii) below.

(i)     The payment of the fees, expenses and disbursements set forth in this paragraph of this Interim Order shall be made within ten (10) days after the receipt by the Debtors, the Committee, and the U.S. Trustee (the "Review Period") of invoices thereof (the "Invoiced Fees") (subject in all respects to applicable privilege or work product doctrines), including a summary description of the services provided and the expenses incurred by the applicable professional arising before or after the Petition Date, as applicable; provided, however, that any such invoice (i) may be redacted to protect privileged, confidential or proprietary information and (ii) shall not be required to contain individual time detail.

(ii)     The Debtors, the Committee and the U.S. Trustee may preserve their right to dispute the reasonableness of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, the Debtors, the Committee or the U.S. Trustee files with the Court a motion or other pleading, on at least ten (10) calendar days prior written notice to the DIP Agent of any hearing on such motion or other pleading, which must contain a specific basis for the objection to the Disputed Invoiced Fees and quantification of the disputed amount of the fees

and expenses invoiced. The Debtors' payment of the Invoiced Fees (other than any Disputed Invoiced Fees pending resolution of such dispute by the parties or disposition by the Court) shall not be delayed based on any objections thereto, and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final non-appealable order of this Court. Failure to object with specificity or to quantify the disputed amount of the invoice subject to such objection will constitute a waiver of any objection to such invoice. None of the Invoiced Fees shall be subject to Court approval or required to be maintained in any specific format, and no recipient of any payment on account thereof shall be required to file with respect thereto any interim or final fee application with the Court.

7.     <u>Amendments, Consents, Waivers, and Modifications</u>.  The Debtors may enter into any amendments, consents, waivers, or modifications to the DIP Loan Documents in accordance with the terms of the DIP Loan Documents without need for further notice and hearing or any order of this Court; <u>provided</u>, <u>however</u>, that any material amendment, waiver, or modification shall require Court approval.  Copies of all amendments, waivers, modifications, whether or not material, shall be provided by the Debtors to counsel to the Creditors' Committee and the U.S. Trustee.

## DIP LIENS AND DIP SUPERPRIORITY CLAIMS

8.   <u>DIP Liens & Priority</u>.

(a)     To secure the DIP Obligations and other obligations of the Debtors under the DIP Facility and DIP Loan Documents, the DIP Agent is hereby granted for the benefit of itself and the DIP Lenders, pursuant to and in accordance with sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, subject to the Carve Out at all times, valid, enforceable, and fully perfected (i) first priority liens on all property of the Debtors' estates in

these Chapter 11 Cases that is not subject to valid, perfect, and non-avoidable liens as of the

Petition Date, excluding claims and causes of action under sections 502(d), 544, 545, 547, 548,

549, and 550 of the Bankruptcy Code (collectively, "Avoidance Actions"); provided, however,

upon entry of the Final Order, liens in favor of the DIP Agent and DIP Lenders shall attach to

and be perfected in any proceeds of Avoidance Actions; (ii) junior liens on all property of the

Debtors' estates in these Chapter 11 Cases, that is subject to valid, perfected, and non-avoidable

liens in existence as of the Petition Date or to valid liens in existence at the time of the Petition

Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the

Bankruptcy Code, other than property that is subject to the existing liens that secure obligations

under the agreements referred to in subsection (iii) below, which liens shall be primed by the

liens to be granted to the DIP Lender as described therein; (iii) first priority, senior priming liens

on all of the property (such property, together with the property described in subsections (i) and

(ii) above, the "DIP Collateral") of the Debtors' estates in these Chapter 11 Cases (including,

without limitation, inventory, accounts receivable, general intangibles, chattel paper, owned real

estate, real property leaseholds, fixtures and machinery and equipment fixtures and machinery

and equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under

license agreements, and other intellectual property and capital stock of subsidiaries) that is

subject to the existing liens that secure the obligations of any other lenders under or in

connection with any existing credit agreement and related documents and agreements and all of

which existing liens (the "Primed Liens") shall be primed by and made subject and subordinate

to the perfected first priority senior liens to be granted to the DIP Agent, for the benefit of itself

and the DIP Lenders, which senior priming liens in favor of the DIP Agent shall also prime any

liens granted after the Petition Date to provide adequate protection in respect of any of the

Primed Liens, subject, in each case, only to the Carve Out (subsections (i), (ii), and (iii) collectively, the "<u>DIP Liens</u>").

(b)     The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise, other than prior payment of the Carve Out.

(c)     The DIP Liens shall be and hereby are deemed fully perfected liens and security interest, effective and perfected upon the date of this Interim Order, without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, account control agreements, or any other agreements or instruments, such that no additional actions need by taken by the DIP Agent or the DIP Lenders to perfect such interests.  Any provision of any lease, loan document, easement, use agreement, proofer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person, in order for any of the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the transactions granting the DIP Agent, for the benefit of itself and the DIP Lenders, a security interest in such fee, leasehold, or other interest or other collateral or the proceeds of any assignment, sale, or other transfer thereof, by any of the Debtors in favor of the DIP Agent, for the benefit of itself and the DIP

Lenders, in accordance with the terms of the DIP Credit Agreement and the other DIP Loan Documents.

9.      <u>DIP Lenders' Superpriority Claim</u>.  The DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted an allowed superpriority administrative expense claim (the "<u>DIP Superpriority Claim</u>") pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Chapter 11 Cases and in any successor case(s) under the Bankruptcy Code (including any case or cases under chapter 7 of the Bankruptcy Code, the "<u>Successor Case(s)</u>") for all DIP Obligations, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof including, without limitation, any proceeds or property recovered in connection with the pursuit of Avoidance Actions.  The DIP Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to prior payment of the Carve Out.  Except as set forth in this Interim Order, without the written consent of the DIP Agent, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases or in any Successor Case and the DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in these Chapter 11 Cases including, without limitation, on account of any break-up fee or expense reimbursement that may be granted by the Court in connection with the sale of the Debtors' assets.

10.     <u>Survival of DIP Liens and DIP Superpriority Claim</u>.   The DIP Liens, DIP Superpriority Claim, and other rights and remedies granted under this Interim Order to the DIP Agent, for the benefit of itself and the DIP Lenders, shall continue in this and any Successor Case(s) and shall be valid and enforceable against any trustee appointed in any or all of the Debtors' Chapter 11 Cases and/or upon the dismissal of any or all of the Debtors' Chapter 11 Cases or any Successor Case(s) and such liens and security interests shall maintain their priority as provided in this Interim Order until all of the DIP Obligations have been indefeasibly paid in full in cash and the DIP Lenders' commitments have been terminated in accordance with the DIP Loan Documents.

11.     <u>Carve Out</u>.   As used in this Interim Order, the "<u>Carve Out</u>" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, (ii) all unpaid professional fees and disbursements incurred by the Debtors and any statutory committees appointed in these Chapter 11 Cases prior to the occurrence of an Event of Default and notice thereof delivered to the Debtors, but only to the extent allowed by the Court at any time and only to the extent of amounts included in the Approved Budget, <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, with respect to SSG Advisors, LLC ("<u>SSG</u>"), the Carve Out shall include such transaction fees as may be agreed to by the Debtors, SSG, the DIP Agent, and the DIP Lenders.   On a weekly basis, the budgeted fees for professionals shall be placed in escrow and released to each professional upon approval of the Court, and (iii) at any time after the occurrence of an Event of Default and notice thereof delivered to the Borrower, to the extent allowed at any time, whether before or after delivery of such notice, whether by interim order, procedural order or otherwise, the payment of accrued and

unpaid professional fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors and the committee and allowed by the Court, not in excess of $100,000 for the Debtors' professionals and the committee's professionals (the "Carve Out Cap"); provided, further, that the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent or the DIP Lenders or the DIP Agent or the DIP Lenders' professionals and nothing herein shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates.

## **ADEQUATE PROTECTION**

12.    Adequate Protection for Prepetition Secured Parties.  Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection for any diminution in the value of the Prepetition Collateral resulting from, among other things: (i) the incurrence of the DIP Obligations secured by a priming DIP Lien, (ii) the use of Cash Collateral, (iii) the imposition of the automatic stay, (iv) the agreement of the Prepetition First Lien Administrative Agent and Prepetition Secured Parties to subordinate their right to receive payment from the proceeds of the Prepetition Collateral to the prior payment of the Carve Out, or (v) otherwise (collectively, the "Prepetition Senior Lender Diminution Claim"), the Prepetition First Lien Administrative Agent and the Prepetition Secured Parties are hereby granted (in each case subject to the DIP Liens, the DIP Superpriority Claim, the Senior Replacement Liens, and prior payment of the Carve Out) the following (collectively, the "Prepetition Senior Lender Adequate Protection Obligations"):

(a)     Subject to paragraph 15 of this Order, to secure the Prepetition Senior Lender Diminution Claim, the Prepetition First Lien Administrative Agent, for itself and for the benefit of the Prepetition Secured Parties, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments) valid, perfected, postpetition security interests and liens (the "Senior Replacement Liens") in and on all of the DIP Collateral, including proceeds of all amounts owed to the Debtors by CMS and, upon entry of a Final DIP Order, proceeds of Avoidance Actions; provided, however, that the Senior Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Obligations on account thereof, and (ii) prior payment of the Carve Out.   The Senior Replacement Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Case.

(b)     Fees and Expenses.  Pursuant to paragraph 6 of this Order, as further adequate protection for the Prepetition Senior Lender Diminution Claim, the Prepetition First Lien Administrative Agent and the Prepetition Secured Parties shall receive monthly reimbursement of professional fees and expenses, including fees and expenses of counsel.

13.     Adequate Protection for Prepetition Second Lien Lenders.  Subject to paragraph 15 of this Order, as adequate protection for any diminution in the value of the Prepetition Second Lien Administrative Agent's interest in the Prepetition Second Lien Collateral (the "Prepetition Second Lien Diminution Claim"), the Prepetition Second Lien Administrative Agent and the

Prepetition Second Lien Lenders are hereby granted (in each case subject to the DIP Liens, the DIP Superpriority Claim, the Senior Replacement Liens and prior payment of the Carve Out) the following (the "Prepetition Second Lien Adequate Protection Obligations"):

(a)     To secure the Prepetition Second Lien Diminution Claim, the Prepetition Second Lien Administrative Agent, for itself and for the benefit of the Prepetition Second Lien Lenders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments) valid, perfected, postpetition security interests and liens (the "Junior Replacement Liens" and together with the Senior Replacement Liens, the "Replacement Liens") in and on all of the DIP Collateral; provided, however, that the Junior Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Obligations on account thereof, (ii) the Senior Replacement Liens, and (iii) prior payment of the Carve Out.  The Junior Replacement Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Case.

## RESTRICTION ON USE OF FUNDS

14.     Notwithstanding anything in this Interim Order or the DIP Loan Documents to the contrary, no proceeds of the DIP Facility, any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve Out may be used to pay any claims for services rendered by any professionals retained by the Debtors, any creditor or party

in interest, a Creditors' Committee, any trustee appointed under these Chapter 11 Cases or any Successor Cases, or any other party to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise, other than from the DIP Agent or DIP Lenders, unless the proceeds of such loans or accommodations are or will be sufficient, and will be used, to indefeasibly pay in full in cash all DIP Obligations, the Prepetition Senior Obligations, and Prepetition Senior Lender Adequate Protection Obligations, or (b) investigate (except as set forth in Paragraph 15 below), assert, join, commence, support or prosecute any action or claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, or the Prepetition Secured Parties, or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, or action, including, without limitation, (i) any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (ii) any action relating to any act, omission or aspect of the relationship between or among any of the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, and the Prepetition Secured Parties, on the one hand, and the Debtors or any of their affiliates, on the other; (iii) any action with respect to the validity and extent of the DIP Obligations or the Prepetition Senior Obligations, or the validity, extent, and priority of the DIP Liens, the Prepetition Senior Liens or the Replacement Liens; (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens, the Prepetition Senior Liens or the Senior Replacement Liens; (v) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) the DIP Agent, the DIP Lenders, the

Prepetition First Lien Administrative Agent, or the Prepetition Secured Parties in respect of the enforcement of their liens and security interests in the DIP Collateral, Cash Collateral or the Prepetition Collateral; (vi) pay any Claim of a Creditor (as such terms are defined in the Bankruptcy Code) inconsistent with the Budget without the prior written consent of the DIP Agent, and the Prepetition First Lien Administrative Agent; and/or (vii) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby or by the DIP Loan Documents. Notwithstanding the foregoing, up to $35,000 in the aggregate of the DIP Facility, DIP Collateral, Cash Collateral, Prepetition Collateral and Carve Out may be used by a Creditors' Committee to investigate the Prepetition Senior Obligations, or the Prepetition Senior Liens and/or claims against the Releasees prior to the expiration of the Challenge Period (as each is defined below).

15.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

(a)    The Debtors' acknowledgements and stipulations set forth in Paragraph E above (the "<u>Debtors' Stipulations</u>") shall be binding upon the Debtors in all circumstances upon entry of this Interim Order.

(b)    The Debtors' Stipulations shall also be binding upon each other party in interest, including any Creditors' Committee unless such Creditors' Committee or any other party in interest having standing, including any Chapter 11 trustee (or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case(s)): (a) commences a Challenge (as defined below) by (x) with respect to a Creditors' Committee, sixty (60) calendar days from the formation of a Creditors' Committee, and (y) with respect to other parties in interest with requisite standing other than the Debtors or a Creditors' Committee, seventy five (75) calendar

days following the date of entry of the Interim Order (such time period established by clauses (x) and (y), shall be referred to as the "Challenge Period") and (b) obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action.

(c)     A "Challenge" means with respect to any party with requisite standing (A) an adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations, or (B) an adversary proceeding against any or all of the Prepetition First Lien Administrative Agent, or the Prepetition Secured Parties in connection with or related to the Prepetition Senior Obligations, or the actions or inactions of any of the Prepetition First Lien Administrative Agent, or the Prepetition Secured Parties arising out of or related to the Prepetition Senior Obligations or otherwise, including, without limitation, any claim against the Prepetition First Lien Administrative Agent, any or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition Senior Obligations (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code ((A) and (B) collectively, the "Challenges" and, each individually, a "Challenge").  Nothing in this Order shall be deemed to provide automatic standing to any party in interest.

(d)     With respect to any party interest that (i) fails to raise a proper Challenge within the Challenge Period or (y) raises a proper Challenge within the Challenge Period which is fully and finally adjudicated in favor of Prepetition First Lien Administrative Agent, or the Prepetition Secured Parties, as applicable, then for all purposes in these Chapter 11 Cases and any Successor Case(s), (i) all payments made to or for the benefit of the Prepetition First Lien Administrative Agent, or the Prepetition Secured Parties, as applicable, pursuant to, or otherwise

authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or avoidance, (ii) any and all such Challenges by any party in interest (including, without limitation, a Creditors' Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed in the Chapter 11 Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed in any Successor Case) shall be deemed to be forever released, waived, and barred, (iii) the Prepetition Senior Obligations shall be deemed to be a fully allowed and fully secured claim within the meaning of section 506 of the Bankruptcy Code, not subject to counterclaim, setoff, subordination, recharacterization, reduction, defense or avoidance, (iv) any and all pre-petition claims or causes of action against the Prepetition First Lien Administrative Agent, or the Prepetition Secured Parties, as applicable, relating in any way to the Debtors shall be forever waived and released by the Debtors, the Debtors' estates and all creditors, interest holders, a Creditors' Committee and other parties in interest in the Chapter 11 Cases and any Successor Case and (v) all matters not subject to the Challenge, including, without limitation, all findings, the Debtors' Stipulations in Paragraph E, all waivers, releases set forth herein, affirmations and other stipulations as to the priority, extent and validity as to the claims, liens and interests of the Prepetition Secured Parties and the Prepetition First Lien Administrative Agent  shall be of full force and effect upon the Debtors, the Debtors' estates and all creditors, equity interest holders, a Creditors' Committee and other parties in interest in the Chapter 11 Cases and any Successor Case.

16. <u>Prohibition on Granting of Additional Liens and Interests</u>. No liens, claims, interests or priority status, other than the Carve Out, having a lien or administrative priority superior to or pari passu with that of the DIP Liens, the DIP Superpriority Claim, or the Senior

Replacement Liens granted by this Interim Order, shall be granted while any portion of the DIP Obligations or Prepetition Senior Obligations remain outstanding, or any commitment under the DIP Loan Documents or Prepetition First Lien Loan Documents remains in effect, without the prior written consent of the DIP Agent and the Prepetition First Lien Administrative Agent.

17.    <u>Release</u>. The release, discharge, waivers, settlements, compromises, and agreements set forth in this Paragraph 17 shall be deemed effective upon entry of the Interim Order, and subject only to the rights set forth in Paragraph 15 above. The Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in these Chapter 11 Cases or any Successor Case) forever and irrevocably  (a) release, discharge, and acquit the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, the Prepetition Secured Parties and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "<u>Releasees</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any claims arising from any actions relating to any aspect of the relationship between the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent or the Prepetition Secured Parties, on the one hand, and the Debtors and their affiliates, on the other hand, including any equitable subordination claims or defenses, with respect to or relating to the Prepetition Senior Obligations, the Prepetition Senior Liens, the Prepetition First Lien Loan Documents, the DIP Facility, the DIP Liens, the DIP Loan Documents, any and all claims and causes of action arising under title 11 of the United States Code, and any and all claims regarding the validity, priority, perfection or avoidability of the

liens or secured claims of the Prepetition First Lien Administrative Agent and the Prepetition

Secured Parties; and (b) waive any and all defenses (including, without limitation, offsets and

counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and

non-avoidability of the Prepetition Senior Obligations and the Prepetition Senior Liens.

### **REMEDIES; MODIFICATION OF AUTOMATIC STAY**

18.    <u>Remedies and Stay Modification</u>.

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code are,

to the extent applicable, vacated and modified without further application or motion to, or order

from, the Court, to the extent necessary so as to permit the following:

i.    whether or not a Default or an Event of Default under the

DIP Loan Documents or a default by any of the Debtors of any of their obligations under this

Interim Order has occurred (A) to require all cash, checks or other collections or proceeds from

DIP Collateral received by any of the Debtors to be deposited in accordance with the

requirements of the DIP Loan Documents or the Prepetition First Lien Credit Agreement, and to

apply any amounts so deposited and other amounts paid to or received by the DIP Agent and the

DIP Lenders under the DIP Loan Documents in accordance with any requirements of the DIP

Loan Documents, (B) the right to file or -record any financing statements, mortgages or other

instruments or other documents to evidence the security interests in and liens upon the DIP

Collateral, (C) the right to charge and collect any interest, fees, costs and other expenses accruing

at any time under the DIP Loan Documents as provided therein, and (D) the right to give the

Debtors any notice provided for in any of the DIP Loan Documents or this Interim Order;

ii.    Subject to Paragraph 18(a)(iv) below, the automatic stay

provisions of Section 362 of the Bankruptcy Code are vacated and modified without the need for

further Court order to permit the DIP Agent, for itself and on behalf of the DIP Lenders, or the DIP Lenders, as applicable, upon the occurrence and during the continuance of an Event of Default, and without any interference from the Debtors or any other party interest, to (I)(A) cease providing the DIP Facility and/or suspend or terminate the commitments under the DIP Loan Documents, and (B) declare all DIP Obligations immediate due and payable, and (II) subject to three (3) business days' prior written notice (which may be delivered by electronic mail) (the "Remedies Notice Period") to the Debtors, their counsel, counsel to any Creditors' Committee and the U.S. Trustee, to exercise all other rights and remedies provided for in the DIP Loan Documents, this Interim Order or under other applicable bankruptcy and non-bankruptcy law including, without limitation, the right to (A) in the case of the DIP Agent, take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; (B) in the case of the DIP Agent, foreclose or otherwise enforce the DIP Liens on any or all of the DIP Collateral; (C) set off any amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Agent and DIP Lenders); and/or (D) exercise any other default-related rights and remedies under the under the DIP Loan Documents or this Interim Order. The Remedies Notice Period shall run concurrently with any notice period provided for under the DIP Loan Documents;

iii.    Immediately upon the occurrence of an Event of Default under the DIP Loan Documents or any of their obligations under this Interim Order, the DIP Agent, for itself and the benefit of the DIP Lenders, may charge interest at the default rate set forth in the DIP Loan Documents without being subject to the Remedies Notice Period;

iv.    The automatic stay of Section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further

action by the Court in the event that the Debtors, the Creditors' Committee, if any, and/or the U.S. Trustee have not obtained an order from this Court to the contrary prior to the expiration of the Remedies Notice Period. During the Remedies Notice Period, the Debtors shall not be permitted to use any Cash Collateral or any DIP Facility proceeds except to pay expenses reasonably necessary to preserve the Debtors' going concern value, including without limitation, compensating employees in accordance with the Approved Budget. The Debtors, a Creditors' Committee, if any, and/or the U.S. Trustee shall have the burden of proof at any hearing on any request by them to reimpose or continue the automatic stay of Section 362(a) of the Bankruptcy Code or to obtain any other injunctive relief;

v.      If the DIP Agent and/or DIP Lenders are entitled, and have elected in accordance with the provisions hereof, to enforce their respective liens or security interests or exercise any other default-related remedies following expiration of the Remedies Notice Period, the Debtors shall cooperate with the DIP Agent or the DIP Lenders in connection with such enforcement by, among other things, (A) providing at all reasonable times access to the Debtors' premises to representatives or agents of the DIP Agent or the DIP Lenders (including any collateral liquidator or consultant), (B) providing the DIP Agent or the DIP Lenders and their representatives or agents, at all reasonable times access to the Debtors' books and records and any information or documents requested by the DIP Agent or the DIP Lenders or their respective representatives, (C) performing all other obligations set forth in the DIP Loan Documents, and (D) taking reasonable steps to safeguard and protect the DIP Collateral, and the Debtors shall not otherwise interfere with or actively encourage others to interfere with the DIP Agent's or the DIP Lenders' enforcement of rights;

vi.        Upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents or a violation of the terms of this Interim Order, the DIP Agent and the DIP Lenders shall have no further obligation to provide financing under the DIP Loan Documents and the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent and the Prepetition Secured Parties shall have no further obligation to permit the continued use of Cash Collateral;

vii.       Upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents or a violation of the terms of this Interim Order, the DIP Lenders may at all times continue to collect and sweep cash as provided herein or as provided in the DIP Loan Documents or the Prepetition First Lien Loan Documents;

viii.      This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of Section 362(a) of the Bankruptcy Code or other injunctive relief requested.

## **MISCELLANEOUS**

19.     Limitation of Section 506(c) Claims.  Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Case at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against, the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent or the Prepetition Secured Parties, or any of their respective claims, the Carve Out, or the DIP Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent, as applicable, of the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, or the Prepetition

Secured Parties.  No action, inaction or acquiescence by the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, or the Prepetition Secured Parties shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, or the Prepetition Secured Parties, any of their respective claims, the Carve Out, or the DIP Collateral.

20.    <u>No Marshaling</u>.  The DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral. Without limiting the generality of the immediately preceding sentence, no party shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral or the Prepetition Collateral after an Event of Default under the DIP Loan Documents, or termination or breach under the DIP Loan Documents.

21.    <u>Equities of the Case Waiver</u>.  Subject to entry of a Final Order, the Prepetition First Lien Administrative Agent and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code. No person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the Prepetition First Lien Administrative Agent or the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the DIP Collateral or the Prepetition Collateral.

22.    <u>Additional Perfection Measures</u>.  The DIP Liens and the Replacement Liens shall be perfected by operation of law immediately upon entry of this Interim Order. None of the Debtors, the DIP Agent, the Prepetition First Lien Administrative Agent, the Prepetition Secured Parties, the Prepetition Second Lien Administrative Agent, or the Prepetition Second Lien

Lenders shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, control agreements, notices of lien or similar instruments in any jurisdiction (including, but not limited to control agreements relating to bank accounts, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property, or filings with any other federal agencies/authorities), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the DIP Liens or the Replacement Liens.

(i)        If the DIP Agent, in its sole discretion, chooses to take any action to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments, or to otherwise record or perfect such security interests and liens, the DIP Agent is hereby authorized, but not directed to, take such action or to request that Debtors take action reasonably requested on its behalf (and Debtors are hereby authorized to take such action) and:

(a)        any such documents or instruments shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and

(b)        no defect in any such act shall affect or impair the validity, perfection, and enforceability of the liens granted hereunder.

(ii)        In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Agent may, in its sole discretion, choose to file a true and complete copy of this Interim Order in any place at which any such

42

instruments would or could be filed, together with a description of the DIP Collateral, and such filing by the DIP Agent shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

23.     <u>Application of Collateral Proceeds</u>.  To the extent required by this Interim Order and the DIP Loan Documents, after an Event of Default, the Debtors are hereby authorized and directed to remit to the DIP Agent or the DIP Lenders, as the case may be, subject to the payment of the Carve Out, one-hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit the DIP Agent or the DIP Lenders to retain and apply all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Loan Documents. In furtherance of the foregoing, (a) all cash, securities, investment property and other items of any Debtor deposited with any bank or other financial institution shall be subject to a perfected, first priority security interest in favor of the DIP Agent (or its designee), (b) upon the expiration of the Remedies Notice Period, each bank or other financial institution with an account of any Debtor is hereby authorized and instructed to comply at all times with any instructions originated by the DIP Agent (or its designee) to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of any Debtor, including, without limitation, any instruction to send to the DIP Agent (or its designee) by wire transfer (to such account as the DIP Agent (or its designee) shall specify, or in such other manner as the DIP Agent (or its designee) shall direct) all such cash, securities, investment property and other items held by it, and (c) any deposit account control agreement executed and delivered by any bank or other financial institution, any

Debtor and the Prepetition First Lien Administrative Agent prior to the Petition Date in connection with the Prepetition First Lien Loan Documents shall establish co-control in favor of the DIP Agent of any and all accounts subject thereto and any and all cash, securities, investment property and other items of any Debtor deposited therein to secure the DIP Obligations (provided that primary control rights shall vest in the DIP Agent), and all rights thereunder in favor of the Prepetition First Lien Administrative Agent shall inure also to the benefit of, and shall be exercisable exclusively by, the DIP Agent, until all of the DIP Obligations have been indefeasibly paid in full, at which time exclusive control shall automatically revert to the Prepetition First Lien Administrative Agent.

24.    <u>Access to Collateral</u>.  Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agent or the DIP Lenders contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon three (3) business days' written notice to the landlord, lienholder, licensor or other third party owner of any leased or licensed premises or intellectual property that an Event of Default under the DIP Loan Document or a default by any of the Debtors of any of their obligations under this Interim Order has occurred and is continuing, the DIP Agent or the DIP Lenders (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agent or the DIP Lenders (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of any of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable lease or license and to use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtors,

which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph, without interference from lienholders, landlords or licensors thereunder, subject to such lienholders, landlords or licensors rights under applicable law. Nothing herein shall require the Debtors, the DIP Agent or the DIP Lenders to assume any lease or license under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Agent and the DIP Lenders in this paragraph, provided, however, that the DIP Lenders shall compensate any counterparty to a lease, contract, or license for use of such lease, contract, or license on a per diem basis.

25.    <u>Delivery of Documentation</u>.  The Debtors (and/or their legal or financial advisors) shall deliver to the DIP Agent, counsel to the DIP Agent, and any financial advisors to the DIP Agent, all financial reports, Approved Budgets, forecasts, and all other legal or financial documentation, pleadings, and/or filings that are either (i) required to be provided (by the Debtors and/or their legal or financial advisors) to the DIP Agent, the DIP Lenders, and/or the DIP Agent's legal and financial advisors pursuant to the DIP Loan Documents or the Prepetition First Lien Loan Documents, or (ii) reasonably requested by the DIP Agent and/or the DIP Lenders (or their legal and financial advisors).

26.    <u>Access to Books and Records</u>.  The Debtors (and/or their legal and financial advisors) will (a) keep proper books, records and accounts in accordance with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to their business and activities, (b) cooperate, consult with, and provide to the DIP Agent and the DIP Lenders all such information as required or allowed under the DIP Loan Documents, the provisions of this Interim Order or that is afforded to the Committee and/or the Committee's respective legal or financial advisors, (c) permit, upon two (2) business days' notice and during

normal business hours, representatives of the DIP Agent and/or the DIP Lenders to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective officers, employees and independent public accountants as often as may reasonably be desired, and (d) permit representatives of the DIP Agent and the DIP Lenders to consult with and advise the Debtors' management on matters concerning the general status of the Debtors' business, financial condition and operations.

27.     <u>Lenders Not Responsible Persons</u>.  In (a) making the decision to provide the DIP Facility; (b) administering the DIP Facility; (c) extending other financial accommodations to the Debtors under the DIP Loan Documents; (d) making the decision to make the loans and financial accommodations under the Prepetition First Lien Loan Documents; (e) administering the loans and financial accommodations extended under the Prepetition First Lien Loan Documents; (f) extending other financial accommodations to the Debtors under the Prepetition First Lien Loan Documents; and (g) making the decision to collect the indebtedness and obligations of the Debtors, neither the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, or the Prepetition Secured Parties, as applicable, shall solely by reason thereof be considered to (x) owe any fiduciary obligation to the Debtors or any other party with respect to their exercise of any consent rights afforded them under the DIP Loan Documents or this Interim Order or (y) be exercising control over any operations of the Debtors or acting in any way as a responsible person, or as an owner or operator under any applicable law, including without limitation, any environmental law (including but not limited to the Comprehensive

Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.*, as either may be amended from time to time, or any similar federal or state statute).

28.    <u>Successors and Assigns</u>.  The DIP Loan Documents and the provisions of this Interim Order shall be binding upon the Debtors, the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, the Prepetition Secured Parties, the Prepetition Second Lien Administrative Agent, and the Prepetition Second Lien Lenders and each of their respective successors and assigns, and shall inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, the Prepetition Secured Parties, and each of their respective successors and assigns including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative, or similar person appointed in a case for any Debtor under any chapter of the Bankruptcy Code. The terms and provisions of this Interim Order shall also be binding on all of the Debtors' creditors, any Creditors' Committee, equity holders, and all other parties in interest, including, but not limited to a trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code.

29.    <u>Binding Nature of Agreement</u>.  Each of the DIP Loan Documents to which any of the Debtors are or will become a party shall constitute legal, valid, and binding obligations of the Debtors party thereto, enforceable in accordance with their terms. The DIP Loan Documents have been or will be properly executed and delivered to the DIP Agent or the DIP Lenders by the Debtors. Unless otherwise consented to in writing, the rights, remedies, powers, privileges, liens, and priorities of the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, and the Prepetition Secured Parties, as applicable, provided for in this Interim Order, the DIP Loan Documents, or otherwise shall not be modified, altered or impaired in any manner by

any subsequent order (including a confirmation or sale order), by any plan of reorganization or liquidation in these Chapter 11 Cases, by the dismissal or conversion of these Chapter 11 Cases or in any subsequent case under the Bankruptcy Code unless and until the DIP Obligations and the Prepetition Senior Obligations have first been indefeasibly paid in full in cash and completely satisfied and the commitments terminated in accordance with the DIP Loan Documents and the Prepetition First Lien Loan Documents.

30.    <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP Lenders all protections afforded by section 364(e) of the Bankruptcy Code. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect the validity of any obligation, indebtedness or liability incurred hereunder by any of the Debtors to the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, and the Prepetition Secured Parties. Notwithstanding any such reversal, stay, modification or vacatur, any postpetition indebtedness, obligation or liability incurred by any of the Debtors to the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, or the Prepetition Secured Parties, prior to written notice to the DIP Agent of the effective date of such action, shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Loan Documents with respect to all such indebtedness, obligations or liability.

31.    <u>Collateral Rights</u>.  If any party who holds a lien or security interest in DIP Collateral or Prepetition Collateral that is junior and/or subordinate to the DIP Liens, the Senior

Replacement Liens or the Prepetition Senior Liens in such DIP Collateral or Prepetition Collateral receives or is paid the proceeds of such DIP Collateral or Prepetition Collateral prior to the indefeasible payment in full in cash and the complete satisfaction of (a) all DIP Obligations under the DIP Loan Documents and termination of the commitment in accordance with the DIP Loan Documents, and (b) the Prepetition Senior Obligations under the Prepetition Senior Loan Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral or Prepetition Collateral in trust for the DIP Lenders and the Prepetition Secured Parties and shall immediately turn over such proceeds for application by the DIP Agent and the Prepetition First Lien Administrative Agent to repay the Prepetition Senior Obligations and the DIP Obligations in accordance with the DIP Loan Documents, the Prepetition First Lien Loan Documents and this Interim Order until indefeasibly paid in full.

32.    <u>No Waiver</u>. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Agent or DIP Lenders, Prepetition First Lien Administrative Agent, or the Prepetition Secured Parties may have to bring or be heard on any matter brought before this Court.

33.    <u>Limits on Lenders' Liability</u>. Nothing in this Interim Order and subject to Paragraph 15 or in any of the DIP Loan Documents, the Prepetition First Lien Loan Documents, or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Prepetition First Lien Administrative Agent, or the Prepetition Secured Parties of any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts.

34. <u>Sale/Conversion/Dismissal</u>.

(a)      Absent the consent of the DIP Agent and the DIP Lenders, the Debtors shall not seek or support entry of any order that provides for either the sale of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code to any party unless, in connection with such event, the proceeds of such sale are or will be indefeasibly paid to the DIP Agent and DIP Lenders on account of the DIP Obligations and the commitments under the DIP Loan Documents and this Interim Order are terminated in accordance therewith on the closing date of such sale.

35.      <u>Priority of Terms</u>. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, the Requested Relief, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" "as set forth in" or "as more fully described in" the DIP Loan Documents (or words of similar import), the terms and provisions of this Interim Order shall govern.

36.      <u>No Third Party Beneficiary</u>. Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

37.      <u>Survival</u>. Except as otherwise provided herein, (a) the protections afforded under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing any of these Chapter 11 Cases or (ii) converting any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code, and (b) the DIP Liens, the Replacement Liens, and the DIP Superiority Claim shall continue in these Chapter 11 Cases, in any such

successor case or after any such dismissal. The DIP Liens, the Replacement Liens, and the DIP Superpriority Claim shall maintain their priorities as provided in this Interim Order and the DIP Loan Documents, and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except with respect to any additional financing to be provided by the DIP Agent or the DIP Lenders in accordance with the Final Order), or any conversion of any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of these Chapter 11 Cases, or by any other act or omission.

38.    <u>Adequate Notice/Scheduling of Final Hearing</u>. The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001, and Bankruptcy Local Rules 2002-1, 4001-l(a), and 9013-l(m). Such notice was good and sufficient under the particular circumstances and no other or further notice of the request for the relief granted at the Interim Hearing is required. The Debtors shall promptly mail copies of this Interim Order and notice of the Final Hearing to any known party affected by the terms of this Interim Order and/or Final Order and any other party requesting notice after the entry of this Interim Order. Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be actually received no later than seven (7) days prior to the Final Hearing at 4:00 p.m. (prevailing Eastern Time) by the following (with electronic copies of any such objection at the time of service to the email address set forth below): (a) counsel to the Debtors, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, DE 19899-1347 (Attn: Curtis S. Miller (cmiller@mnat.com) and Derek C. Abbot (dabbott@mnat.com)); (b) counsel to the DIP Agent and Prepetition First Lien Administrative Agent, Proskauer Rose LLP, One International Place, Boston, MA 02110-2600 (Attn: Charles A. Dale, Esq.

(cdale@proskauer.com)); and (c) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Jane M. Leamy (Jane.M.Leamy@usdoj.gov)). The Court shall conduct a Final Hearing on the Requested Relief commencing on _____, 2019 at _____ (prevailing Eastern Time).

39.     <u>Immediate Binding Effect; Entry of Interim Order</u>. This Interim Order shall not be stayed and shall be valid and fully effective immediately upon entry, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, and 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Interim Order on the Court's docket in these Chapter 11 Cases.

40.     <u>Proofs of Claim</u>. Notwithstanding any order of this Court to the contrary, the Prepetition First Lien Administrative Agent, Prepetition Secured Parties, DIP Agent, and DIP Lenders hereby are relieved of any obligation or requirement to file proofs of claim in the Chapter 11 Cases with respect to any Prepetition Senior Obligations, or DIP Obligations and any other claims or liens granted hereunder or created hereby. Upon approval of this Interim Order, the Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition First Lien Administrative Agent and the Prepetition Secured Parties, and the Prepetition First Lien Administrative Agent and the Prepetition Secured Parties shall be treated under section 502(a) of the Bankruptcy Code as if they each have filed a proof of claim. Notwithstanding the foregoing, the Prepetition First Lien Administrative Agent and the Prepetition Secured Parties are hereby authorized and entitled, in their discretion, but not required, to file (and amend and/or supplement, as they see fit) a proof of claim and/or aggregate proofs of claim in each of these Chapter 11 Cases or Successor Cases for any claim allowed herein.

41.    <u>Retention of Jurisdiction</u>. This Court shall retain exclusive jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order.

Dated: _____, 2019
        Wilmington, Delaware


_____
UNITED STATES BANKRUPTCY JUDGE